# NORTH HAVEN BOARD OF EDUCATION ET AL. *v.* BELL, SECRETARY OF EDUCATION, ET AL.

No. 80–986.   Argued December 9, 1981—Decided May 17, 1982

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, STEVENS, and O'CONNOR, JJ., joined. POWELL, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 540.

*Susan K. Krell* argued the cause for petitioner North Haven Board of Education. *Paul E. Knag* argued the cause for petitioner Trumbull Board of Education. With them on the briefs were *Clifford R. Oviatt, Jr.*, and *Richard W. Rutherford*.

*Solicitor General Lee* argued the cause for the federal respondents. With him on the brief were *Assistant Attorney General Reynolds, Deputy Solicitor General Wallace, Elinor Hadley Stillman, Brian K. Landsberg*, and *Marie E. Klimesz*. *Beverly J. Hodgson* argued the cause and filed a brief for respondent Linda Potz.*

---

*Briefs of *amici curiae* urging reversal were filed by *Robert E. Williams* and *Douglas S. McDowell* for the Equal Employment Advisory Council; and by *Gordon C. Coffman* and *John Michael Facciola* for Hillsdale College.

Briefs of *amici curiae* urging affirmance were filed by *Margaret A. Kohn* for the American Association of University Women et al.; by *Joseph Onek* for Birch Bayh et al.; and by *Barbara D. Underwood* and *Burke Marshall* for the Yale Law Women's Association.

JUSTICE BLACKMUN delivered the opinion of the Court.

At issue here is the validity of regulations promulgated by the Department of Education pursuant to Title IX of the Education Amendments of 1972, Pub. L. 92–318, 86 Stat. 373, as amended, 20 U. S. C. § 1681 *et seq.* These regulations prohibit federally funded education programs from discriminating on the basis of gender with respect to employment.

I

Title IX proscribes gender discrimination in education programs or activities receiving federal financial assistance. Patterned after Title VI of the Civil Rights Act of 1964, Pub. L. 88–352, 78 Stat. 252, 42 U. S. C. § 2000d *et seq.* (1976 ed. and Supp. IV), Title IX, as amended, contains two core provisions. The first is a "program-specific" prohibition of gender discrimination:

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." § 901(a), 20 U. S. C. § 1681(a).

Nine statutory exceptions to § 901(a)'s coverage follow. See §§ 901(a)(1)–(9).[1]

The second core provision relates to enforcement. Section 902, 20 U. S. C. § 1682, authorizes each agency awarding federal financial assistance to any education program to promulgate regulations ensuring that aid recipients adhere to § 901(a)'s mandate. The ultimate sanction for noncompliance is termination of

---

[1] Section 901(a)(1) provides that, with respect to admissions, § 901(a) applies only to institutions of vocational education, professional education, and graduate higher education, and to public institutions of undergraduate higher education. Specific exceptions are made for the admissions policies of schools that begin admitting students of both sexes for the first time,

federal funds or denial of future grants.[2]  Like § 901, § 902 is program-specific:

> "[S]uch termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding [of noncompliance] has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found . . . ."[3]

In 1975, the Department of Health, Education, and Welfare (HEW) invoked its § 902 authority to issue regulations

---

§ 901(a)(2); religious schools, § 901(a)(3); military schools, § 901(a)(4); the admissions policies of public institutions of undergraduate higher education that traditionally and continually have admitted students of only one gender, § 901(a)(5); social fraternities and sororities, and voluntary youth service organizations, § 901(a)(6); Boys/Girls State/Nation conferences, § 901(a)(7); father-son and mother-daughter activities at educational institutions, § 901(a)(8); and scholarships awarded in "beauty" pageants by institutions of higher education, § 901(a)(9).

[2] Funding may not be terminated, however, until after the agency determines that noncompliance cannot be achieved by voluntary means; the recipient is given a hearing before an administrative law judge, who makes a recommendation subject to administrative and judicial review; and a report is filed with the appropriate House and Senate committees and no action is taken on that report for 30 days.  See §§ 902, 903; 34 CFR §§ 106.71, 100.6–100.11, pt. 101 (1980).

[3] Section 902 provides in full:

"Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 901 with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken.  No such rule, regulation, or order shall become effective unless and until approved by the President.  Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an

governing the operation of federally funded education programs.[4] These regulations extend, for example, to policies involving admissions, textbooks, and athletics. See 34 CFR pt. 106 (1980).[5] Interpreting the term "person" in § 901(a) to encompass employees as well as students, HEW included among the regulations a series entitled "Subpart E," which deals with employment practices, ranging from job classifications to pregnancy leave. See 34 CFR §§ 106.51–106.61 (1980). Subpart E's general introductory section provides:

> "No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination in employment, or recruitment,

---

express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report." 86 Stat. 374 (emphasis in original).

[4] HEW's functions under Title IX were transferred in 1979 to the Department of Education by § 301(a)(3) of the Department of Education Organization Act, Pub. L. 96–88, 93 Stat. 678, 20 U. S. C. § 3441(a)(3) (1976 ed., Supp. IV). Because many of the relevant actions in this case were taken by HEW prior to reorganization, both agencies are referred to herein as HEW.

[5] The regulations initially appeared at 34 CFR pt. 86 (1972), but were recodified in connection with the establishment of the Department of Education. 45 Fed. Reg. 30802 (1980). See n. 4, *supra.*

consideration, or selection therefor, whether full-time or part-time, under any education program or activity operated by a recipient which receives or benefits from Federal financial assistance." § 106.51(a)(1).[6]

## II

Petitioners are two Connecticut public school boards that brought separate suits challenging HEW's authority to issue the Subpart E regulations. Petitioners contend that Title IX was not meant to reach the employment practices of educational institutions.

A. *The North Haven case.* The North Haven Board of Education (North Haven) receives federal funds for its education programs and activities and is therefore subject to Title IX's prohibition of gender discrimination. Since the 1975–1976 school year, North Haven has devoted between 46.8% and 66.9% of its federal assistance to the salaries of its employees; this practice is expected to continue.[7]

In January 1978, Elaine Dove, a tenured teacher in the North Haven public school system, filed a complaint with HEW, alleging that North Haven had violated Title IX by refusing to rehire her after a one-year maternity leave. In response to this complaint, HEW began to investigate the school board's employment practices and sought from petitioner information concerning its policies on hiring, leaves of absence, seniority, and tenure. Asserting that HEW lacked authority to regulate employment practices under Title IX, North Haven refused to comply with the request.

---

[6] The Department of Agriculture also has issued regulations implementing Title IX. These include employment practices provisions that track the regulations at issue here. See 7 CFR §§ 15a.51–15a.61 (1980). In addition, the Small Business Administration has promulgated regulations prohibiting employment discrimination, which are based in part on Title IX. See 13 CFR § 113.3 (1981). See generally Comment, 129 U. Pa. L. Rev. 417, 418, nn. 7 and 8 (1980).

[7] See *North Haven Bd. of Ed.* v. *Hufstedler,* 629 F. 2d 773, 774–775 (CA2 1980).

When HEW then notified petitioner that it was considering administrative enforcement proceedings, North Haven brought this action in the United States District Court for the District of Connecticut. The complaint sought a declaratory judgment that the Subpart E regulations exceeded the authority conferred on HEW by Title IX, and an injunction prohibiting HEW from attempting to terminate the school district's federal funds on the basis of those regulations. The parties filed cross-motions for summary judgment, and on April 24, 1979, the District Court granted North Haven's motion. App. to Pet. for Cert. 51A. Agreeing with petitioner that Title IX was not intended to apply to employment practices, the court invalidated the employment regulations and permanently enjoined HEW from interfering with North Haven's federal funds because of noncompliance with those regulations.

B. *The Trumbull case.* The Trumbull Board of Education (Trumbull) likewise receives financial support from the Federal Government and must therefore adhere to the requirements of Title IX and appropriate implementing regulations. In October 1977, HEW began investigating a complaint filed by respondent Linda Potz, a former guidance counselor in the Trumbull school district. Potz alleged that Trumbull had discriminated against her on the basis of gender with respect to job assignments, working conditions, and the failure to renew her contract. In September 1978, HEW notified Trumbull that it had violated Title IX and warned that corrective action, including respondent's reinstatement, must be taken.

Trumbull then filed suit in the United States District Court for the District of Connecticut, contending that HEW's Title IX employment regulations were invalid and seeking declaratory and injunctive relief. On the basis of its decision in *North Haven*, the District Court granted Trumbull's motion for summary judgment on May 24, 1979. App. to Pet. for

Cert. 76A.[8] The court subsequently amended the judgment, on Trumbull's request, to include injunctive and declaratory relief similar to that ordered in North Haven's case. *Id.*, at 77A, 91A–92A.

C. *The appeal.* The two cases were consolidated on appeal, and the Court of Appeals for the Second Circuit reversed. *North Haven Bd. of Ed.* v. *Hufstedler*, 629 F. 2d 773 (1980). Finding the language of § 901 inconclusive, the court examined the legislative history and concluded that the provision was intended to prohibit employment discrimination. The court also found the Subpart E regulations consistent with § 902, which the court read as directing only that "any *termination* of funds be limited to the particular program or programs in which noncompliance with § 901 is found . . . ." 629 F. 2d, at 785 (emphasis added). Section 902, the Second Circuit held, does not circumscribe HEW's authority to issue *regulations* prohibiting gender discrimination in employment and does not require the Department "to specify prior to termination which particular programs receiving financial assistance are covered by its regulations." *Ibid.* Because HEW had not exercised its § 902 authority to terminate federal assistance to either North Haven or Trumbull, the court declined to decide whether HEW could do so in these cases. The court remanded the cases to the District Court to determine whether petitioners had violated the HEW regulations and, if so, what remedies were appropriate.

Because other federal courts have invalidated the employ-

---

[8] Because the court awarded summary judgment in petitioner's favor before respondent Potz had an opportunity to reply to Trumbull's motion, Potz filed a motion to set aside the judgment and a cross-motion for summary judgment. On September 13, 1979, the court denied both motions, rejecting Potz' contention that the judgment was inconsistent with this Court's opinion in *Cannon* v. *University of Chicago*, 441 U. S. 677 (1979). App. to Pet. for Cert. 77A.

ment regulations as unauthorized by Title IX,[9] we granted certiorari to resolve the conflict. 450 U. S. 909 (1981).

## III

### A

Our starting point in determining the scope of Title IX is, of course, the statutory language. See *Greyhound Corp.* v. *Mt. Hood Stages, Inc.*, 437 U. S. 322, 330 (1978). Section 901(a)'s broad directive that "no person" may be discriminated against on the basis of gender appears, on its face, to include employees as well as students. Under that provision, employees, like other "persons," may not be "excluded from participation in," "denied the benefits of," or "subjected to discrimination under" education programs receiving federal. financial support.

Employees who directly participate in federal programs or who directly benefit from federal grants, loans, or contracts clearly fall within the first two protective categories described in § 901(a). See *Islesboro School Comm.* v. *Califano*, 593 F. 2d 424, 426 (CA1), cert. denied, 444 U. S. 972

---

[9] Four Courts of Appeals and several District Courts have so held. See *Seattle University* v. *HEW*, 621 F. 2d 992 (CA9), cert. granted *sub nom. United States Dept. of Ed.* v. *Seattle Univ.*, 449 U. S. 1009 (1980); *Romeo Community Schools* v. *HEW*, 600 F. 2d 581 (CA6), cert. denied, 444 U. S. 972 (1979); *Junior College Dist. of St. Louis* v. *Califano*, 597 F. 2d 119 (CA8), cert. denied, 444 U. S. 972 (1979); *Islesboro School Comm.* v. *Califano*, 593 F. 2d 424 (CA1), cert. denied, 444 U. S. 972 (1979); *Grove City College* v. *Harris*, 500 F. Supp. 253 (WD Pa. 1980), appeal pending, Nos. 80–2383, 80–2384 (CA3); *Kneeland* v. *Bloom Township High School Dist.*, 484 F. Supp. 1280 (ND Ill. 1980); *McCarthy* v. *Burkholder*, 448 F. Supp. 41 (Kan. 1978).

But see *Piascik* v. *Cleveland Museum of Art*, 426 F. Supp. 779, 781, n. 1 (ND Ohio 1976). Cf. *Dougherty Cty. School System* v. *Harris*, 622 F. 2d 735 (CA5 1980), cert. pending *sub nom. Bell* v. *Dougherty Cty. School System*, No. 80–1023. The Fifth Circuit invalidated the Subpart E regulations on the ground that they do not apply only to specific programs that receive federal financial assistance, but ruled that Title IX permits the Secretary to regulate at least some employment practices.

(1979).   In addition, a female employee who works in a federally funded education program is "subjected to discrimination under" that program if she is paid a lower salary for like work, given less opportunity for promotion, or forced to work under more adverse conditions than are her male colleagues. See *Dougherty Cty. School System* v. *Harris*, 622 F. 2d 735, 737–738 (CA5 1980), cert. pending *sub nom. Bell* v. *Dougherty Cty. School System*, No. 80–1023.

There is no doubt that "if we are to give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language." *United States* v. *Price*, 383 U. S. 787, 801 (1966); see also *Griffin* v. *Breckenridge*, 403 U. S. 88, 97 (1971); *Daniel* v. *Paul*, 395 U. S. 298, 307–308 (1969); *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, 437 (1968); *Piedmont & Northern R. Co.* v. *ICC*, 286 U. S. 299, 311–312 (1932).   Because § 901(a) neither expressly nor impliedly excludes employees from its reach, we should interpret the provision as covering and protecting these "persons" unless other considerations counsel to the contrary.   After all, Congress easily could have substituted "student" or "beneficiary" for the word "person" if it had wished to restrict the scope of § 901(a).[10]

Petitioners, however, point to the nine exceptions to § 901(a)'s coverage set forth in §§ 901(a)(1)–(9).   See n. 1, *supra*.   The exceptions, the school boards argue, are directed only at students, and thus indicate that § 901(a) similarly applies only to students.   But the exceptions are not concerned solely with students and student activities: two of them exempt an entire class of institutions—religious and military schools—and are not limited to student-related activities at such schools.   See §§ 901(a)(3), (4).   Moreover, petitioners' argument rests on an inference that is by no means compelled; in fact, the absence of a specific exclusion for em-

---

[10] According to the dissent, the ease with which any confusion "could have been avoided by the legislative draftsman . . ." suggests that "person" should be given its ordinary meaning.   *Post*, at 551.

ployment among the list of exceptions tends to support the Court of Appeals' conclusion that Title IX's broad protection of "person[s]" does extend to employees of educational institutions. See *Andrus* v. *Glover Construction Co.*, 446 U. S. 608, 616–617 (1980).[11]

Although the statutory language thus seems to favor inclusion of employees, nevertheless, because Title IX does not expressly include or exclude employees from its scope, we turn to the Act's legislative history for evidence as to whether Congress meant somehow to limit the expansive language of § 901.[12]

---

[11] Nor does § 901(b) qualify the broad language of § 901(a). Section 901(b) repeats the language identifying certain of the categories of persons listed in § 901(a); it provides no clearer indication of the intended scope of § 901(a) than does that section itself.

[12] In construing a statute, this Court normally accords great deference to the interpretation, particularly when it is longstanding, of the agency charged with the statute's administration. See, *e. g., NLRB* v. *Bell Aerospace Co.*, 416 U. S. 267, 274–275 (1974); *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 381 (1969). But the administrative interpretation of Title IX has changed, and a split has occurred between the federal agencies responsible for promulgating Title IX regulations. On July 27, 1981, respondent Bell, Secretary of Education, wrote to the Attorney General expressing his dissatisfaction with the existing Subpart E regulations and his belief that they were ultra vires. The Secretary sought to amend the regulations to make them parallel with the Department of Education regulations implementing Title VI of the Civil Rights Act of 1964. See 34 CFR pt. 100 (1980). Specifically, Secretary Bell proposed to have the regulations cover employment practices "only when the complaint shows a clear nexus between the alleged employment discrimination and discrimination against the students, or when the complaint shows that the complainant is a beneficiary of a program in which a primary objective of the Federal financial assistance is to provide employment." Letter from Terrel H. Bell to William French Smith, reprinted in Daily Labor Report, No. 150, p. A–5 (Aug. 5, 1981). Cf. 34 CFR § 100.3(c) (1980). In response, the Attorney General, to whom the President has delegated the authority given him by § 902 to approve regulations promulgated pursuant to Title IX, refused to approve the Department's suggestion and continues to defend the existing regulations. See Brief for Federal Respondents 37, n. 26; Tr. of Oral Arg. 18–19.

B

In the early 1970's, several attempts were made to enact legislation banning discrimination against women in the field of education. Although unsuccessful, these efforts included prohibitions against discriminatory employment practices.[13]

The Department of Education has withdrawn its request to the Attorney General pending this Court's decision in this case. See *id.*, at 17–18. Because the Subpart E regulations therefore are still in effect, respondent Bell's changed view does not moot the litigation. See *American Textile Mfrs. Institute, Inc.* v. *Donovan,* 452 U. S. 490, 505, n. 25 (1981). It, however, does undercut the argument that the regulations are entitled to deference as the interpretation of the agency charged with Title IX's enforcement. See *Southeastern Community College* v. *Davis,* 442 U. S. 397, 412, n. 11 (1979).

[13] Title IX grew out of hearings on gender discrimination in education, held in 1970 by a special House Subcommittee on Education chaired by Representative Green. See Discrimination Against Women: Hearings on Section 805 of H. R. 16098 before the Special Subcommittee on Education of the House Committee on Education and Labor, 91st Cong., 2d Sess. (1970) (1970 Hearings). Much of the testimony focused on discrimination against women in employment. See generally, *e. g.,* Kuhn, Title IX: Employment and Athletics Are Outside HEW's Jurisdiction, 65 Geo. L. J. 49, 59–60 (1976); Comment, 1976 B. Y. U. L. Rev. 133, 140–141. The proposal on which the hearings were held, however, never emerged from committee. That provision, § 805 of H. R. 16098, would have extended the prohibitions of Title VI of the Civil Rights Act of 1964 to discrimination based on gender by adding the word "sex" to § 601; would have made Title VII of the Civil Rights Act of 1964 applicable to public school employees and education employees generally; would have amended the Civil Rights Act of 1957 to include gender discrimination within the jurisdiction of the Civil Rights Commission; and would have extended the application of the Equal Pay Act to executive, administrative, and professional employees.

Then, in 1971, Senator Bayh introduced an amendment to S. 659, 92d Cong., 1st Sess. (1971), the Education Amendments of 1971, which would have prohibited recipients of federal education funds from discriminating against women. The amendment, which Senator Bayh characterized as identical to the prohibition against discrimination on the basis of race contained in Title VI of the Civil Rights Act of 1964, plainly was meant to proscribe discrimination in employment. See 117 Cong. Rec. 30155, 30403 (1971); see also *id.*, at 30411 (Sen. McGovern announces his intent to support Sen. Bayh's "similar amendment" rather than introducing his own,

In 1972, the provisions ultimately enacted as Title IX were introduced in the Senate by Senator Bayh during debate on the Education Amendments of 1972. In addition to prohibiting gender discrimination in federally funded education programs and threatening termination of federal assistance for noncompliance, the amendment included provisions extending the coverage of Title VII and the Equal Pay Act to educational institutions. Summarizing his proposal, Senator Bayh divided it into two parts—first, the forerunner of § 901(a), and then the extensions of Title VII and the Equal Pay Act:

> "Amendment No. 874 is broad, but basically it closes loopholes in existing legislation relating to general education programs and employment resulting from those programs. . . . *[T]he heart of this amendment* is a provision banning sex discrimination in educational programs receiving Federal funds. The amendment would cover such crucial aspects as admissions procedures, scholarships, and *faculty employment,* with limited exceptions. Enforcement powers include fund termination provisions—and appropriate safeguards—parallel to those found in title VI of the 1964 Civil Rights Act. *Other important provisions* in the amendment would extend the equal employment opportunities provisions of title VII of the 1964 Civil Rights Act to educational institutions, and extend the Equal Pay for Equal Work Act to include executive, administrative and professional women." 118 Cong. Rec. 5803 (1972) (emphasis added).

The Senator's description of § 901(a), the "heart" of his amendment, indicates that it, as well as the Title VII and Equal Pay Act provisions, was aimed at discrimination in employment.[14]

---

which explicitly forbade gender discrimination in employment). The amendment never came to a vote on the floor of the Senate, however, because it was ruled nongermane. See *id.,* at 30415.

[14] Senator Bayh's 1971 proposal, see n. 13, *supra,* did not include provisions amending Title VII and the Equal Pay Act. His statements that the

Similarly, in a prepared statement summarizing the amendment, Senator Bayh discussed the general prohibition against gender discrimination:

> "Central to my amendment are sections 1001–1005, which would prohibit discrimination on the basis of sex in federally funded education programs. . . .
>
> .      .      .      .      .
>
> "This portion of the amendment covers discrimination in all areas where abuse has been mentioned—*employment practices for faculty and administrators*, scholarship aid, admissions, access to programs within the institution such as vocational education classes, and so forth." 118 Cong. Rec. 5807 (1972) (emphasis added).

Petitioners observe that the discussion of this portion of the amendment appears under the heading "A. Prohibition of Sex Discrimination in Federally Funded Education Programs," while the provisions involving Title VII and the Equal Pay Act are summarized under the heading "B. Prohibition of Education-Related Employment Discrimination." But we are not willing to ascribe any particular significance to these headings. The Title VII and Equal Pay Act portions of the Bayh amendment are more narrowly focused on employment discrimination than is the general ban on gender discrimination, and the headings reflect that difference. Especially in light of the explicit reference to employment practices in the description of the amendment's general provision, however, the headings do not negate Senator Bayh's intent that employees as well as students be protected by the first portion of his amendment.[15]

_____

1971 amendment nevertheless would prohibit employment discrimination thus rebut petitioners' contention that the Senator's discussion of employment discrimination during debate on the 1972 version of his amendment referred solely to the provisions regarding Title VII and the Equal Pay Act.

[15] The headings and corresponding divisions of Senator Bayh's summary of his amendment do suggest, however, that the Senator's reference to

The final piece of evidence from the Senate debate on the Bayh amendment appears during a colloquy between Senator Bayh and Senator Pell, chairman of the Senate Subcommittee on Education and floor manager of the education bill. In response to Senator Pell's inquiry about the scope of the sections that in large part became §§ 901(a) and (b), Senator Bayh stated:

> "As the Senator knows, we are dealing with three basically different types of discrimination here. We are dealing with discrimination in admission to an institution, discrimination of available services or studies within an institution once students are admitted, and *discrimination in employment within an institution, as a member of a faculty or whatever.*
> *"In the area of employment, we permit no exceptions."*
> *Id.,* at 5812 (emphasis added).[16]

Although the statements of one legislator made during debate may not be controlling, see, *e. g., Chrysler Corp.* v. *Brown,* 441 U. S. 281, 311 (1979), Senator Bayh's remarks, as those of the sponsor of the language ultimately enacted,

---

"sections 1001–1005" in describing the prohibition of discrimination in federally funded education programs is of little significance. Although, as the dissent points out, *post,* at 548, § 1005 of the amendment comprised the Title VII provisions, the detailed discussion of the Title VII amendments in part B of the summary, the absence of any further mention of those provisions in part A's description of Title IX, and the fact that the Title VII provisions were not limited to "federally funded education programs" indicate that the Senator's reference to § 1005 in part A was inadvertent.

[16] Moreover, in reply to Senator Pell's questions regarding Title IX's application to the faculty of religious and military schools, Senator Bayh made clear that such institutions were explicitly excepted from the reach of § 901(a). See 118 Cong. Rec. 5813 (1972). His response makes no sense if Senator Bayh thought that the provision was not aimed at protecting any employees; in that event, he could have answered Senator Pell's questions simply by stating that employment discrimination was dealt with in the Title VII and Equal Pay Act portions of the amendment, rather than in § 901.

are an authoritative guide to the statute's construction. See, *e. g., FEA* v. *Algonquin SNG, Inc.*, 426 U. S. 548, 564 (1976) (such statements "deserv[e] to be accorded substantial weight . . ."); *NLRB* v. *Fruit Packers*, 377 U. S. 58, 66 (1964); *Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 U. S. 384, 394–395 (1951). And, because §§ 901 and 902 originated as a floor amendment, no committee report discusses the provisions; Senator Bayh's statements—which were made on the same day the amendment was passed, and some of which were prepared rather than spontaneous remarks— are the only authoritative indications of congressional intent regarding the scope of §§ 901 and 902.

The legislative history in the House is even more sparse. H. R. 7248, 92d Cong., 1st Sess. (1971), the Higher Education Act of 1971, contained, as part of its Title X, a general prohibition against gender discrimination in federally funded education programs that was identical to the corresponding section of the Bayh amendment and to § 901(a) as ultimately enacted. But § 1004 of Title X, like § 604 of Title VI, see 42 U. S. C. § 2000d–3, provided that nothing in Title X authorized action "by any department or agency with respect to any employment practice . . . except where a primary objective of the Federal financial assistance is to provide employment." The debate on Title X included no discussion of this limitation. See 117 Cong. Rec. 39248–39263 (1971).[17]

When the House and Senate versions of Title IX were sub-

---

[17] Portions of that debate suggest, however, that, despite § 1004, Members of the House thought that the ban on discrimination protected employees. In discussing a proposed amendment to § 1001 of the bill, the section similar to § 901(a) of Title IX, Representative Smith quoted § 1001, described it as containing the "effective provisions" of Title X, and observed that the amendment "would exempt out of this title all undergraduate schools and would leave the prohibition against sex discrimination to apply to graduate education and faculty employment and salaries." 117 Cong. Rec. 39255 (1971); see also *id.*, at 39260 (remarks of Rep. Erlenborn); *id.*, at 39262 (remarks of Rep. Quie). Despite the explicit exclusion of employment discrimination in § 1004, then, there was at least some feeling on the

mitted to the Conference Committee, § 1004 was deleted. The Conference Reports simply explained:

"[T]he House amendment, but not the Senate amendment, provided that nothing in the title authorizes action by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment. The House recedes." S. Conf. Rep. No. 92–798, p. 221 (1972); H. R. Conf. Rep. No. 92–1085, p. 221 (1972).

Expressly a conscious choice, therefore, the omission of § 1004 suggests that Congress intended that § 901 prohibit gender discrimination in employment.

Petitioners and the dissent contend, however, that § 1004 was deleted in order to avoid an inconsistency: Title IX included provisions relating to the Equal Pay Act,[18] which obviously concerned employment, and § 1004 conflicted with those portions of the Act. See Sex Discrimination Regulations: Hearings before the Subcommittee on Postsecondary Education of the House Committee on Education and Labor, 94th Cong., 1st Sess., 409 (1975) (1975 Hearings) (remarks of Rep. O'Hara) (arguing that Title IX was a "cut and paste job," using "a Xerox" of Title VI, and that § 1004 "got in through a drafting error"). As the Court of Appeals observed, however, the Conference Committee could easily have altered the wording of § 1004 to make clear that its limitation applied only to § 901[19] or could have noted in the Con-

---

floor of the House that employment discrimination was nonetheless prohibited by the provision that would become § 901(a).

[18] The proposed amendments to Title VII had been deleted because identical provisions had already been enacted as part of the Equal Employment Opportunity Act of 1972, Pub. L. 92–261, 86 Stat. 103, 42 U. S. C. § 2000e(a).

[19] The Court of Appeals suggested the following language: "'Nothing in § 901 shall apply to any employees of any educational institution subject to

ference Reports that the omission was necessitated by the apparent inconsistency. Instead, by stating that "[t]he House recedes," the Reports suggest that the Senate version of Title IX, which was intended to ban discriminatory employment practices, prevailed for substantive reasons. See *Gulf Oil Corp.* v. *Copp Paving Co.*, 419 U. S. 186, 199–200 (1974) (deletion of a provision by a Conference Committee "militates against a judgment that Congress intended a result that it expressly declined to enact"); *Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 U. S., at 391–392. Identical language—"The House recedes" or "The Senate recedes"—appears in the Conference Reports with respect to all other changes made in Title IX during the conference. See S. Conf. Rep. No. 92–798, pp. 221–222 (1972). See also 118 Cong. Rec. 18437 (1972) (letters printed in the record during the Senate debate on the Conference Report, which imply that employment discrimination is prohibited by § 901).

Petitioners insist additionally that a specific exclusion for employment, such as that contained in § 1004, was unnecessary to limit the scope of § 901. Pointing out that Title IX was patterned after Title VI of the Civil Rights Act of 1964, the school boards contend that the addition of § 604 to Title VI was not viewed by Congress as diminishing the scope of the Act; rather, petitioners argue, it was agreed that Title VI would not prohibit employment discrimination even before § 604 made the exclusion explicit.

This focus on the history of Title VI—urged by petitioners and adopted by the dissent—is misplaced. It is Congress' intention in 1972, not in 1964, that is of significance in interpreting Title IX. See *Cannon* v. *University of Chicago*, 441 U. S. 677, 710–711 (1979). The meaning and applicability of Title VI are useful guides in construing Title IX, therefore, only to the extent that the language and history of Title IX do not suggest a contrary interpretation. Moreover,

---

this title except where a primary objective of the Federal financial assistance is to provide employment.'" 629 F. 2d, at 783.

whether § 604 clarified or altered the scope of Title VI,[20] it is apparent that § 601 alone was not considered adequate to exclude employees from the statute's coverage. If Congress had intended that Title IX have the same reach as Title VI, therefore, we assume that it would have enacted counterparts to both § 601 and § 604. For although two statutes may be similar in language and objective, we must not fail to give effect to the differences between them. See *Lorillard* v. *Pons*, 434 U. S. 575, 584–585 (1978).

In our view, the legislative history thus corroborates our reading of the statutory language and verifies the Court of Appeals' conclusion that employment discrimination comes within the prohibition of Title IX.[21]

## C

The postenactment history of Title IX provides additional evidence of the intended scope of the Title and confirms Con-

---

[20] Petitioners oversimplify the role of § 604. Some Members of Congress did not find the language of § 601 clearly limited to a certain class of beneficiaries. See 110 Cong. Rec. 2484 (1964) (remarks of Rep. Poff); Civil Rights: Hearings on H. R. 7152 before the House Committee on Rules, 88th Cong., 2d Sess., 228 (1964) (colloquy between Rep. Avery and Rep. McCulloch); *id.*, at 143 (remarks of Rep. Celler); *id.*, at 197–198 (colloquy between Rep. Avery and Rep. Celler); *id.*, at 379–380 (remarks of Rep. Poff). Section 604 was thereafter added in the Senate, as part of the Dirksen-Mansfield substitute bill; although the provision has been viewed as merely clarifying the scope of Title VI, see 110 Cong. Rec. 12714, 12720 (1964) (remarks of Sen. Humphrey); Kuhn, 65 Geo. L. J., at 53, it has also been considered a substantive change, see 110 Cong. Rec. 14219–14220 (1964) (remarks of Sen. Holland); Comment, 129 U. Pa. L. Rev., at 447 ("The employment exemption in title VI was amended onto the statute as part of a substitute written during informal bargaining between the Senate's Democratic and Republican leadership with the intention of providing a compromise that would garner enough votes to end the ongoing filibuster").

[21] Thus, we do not, as the dissent charges, "rel[y] on legislative history to add omitted words . . . ." *Post*, at 550. Rather, we use the legislative history as a guide to interpreting the "critical words" that Congress did include in Title IX. *Ibid.* It is the dissent that uses the legislative history—of a different statute—to rewrite Title IX so as to restrict its reach.

gress' desire to ban employment discrimination in federally financed education programs. Following the passage of Title IX, Senator Bayh published in the Congressional Record a summary of the final version of the bill. That description expressly distinguishes Title VI of the Civil Rights Act of 1964 with respect to employment practices:

> "Title VI . . . specifically excludes *employment* from coverage (except where the primary objective of the federal aid is to provide employment). *There is no similar exemption for employment* in the sex discrimination provisions relating to federally assisted education programs." 118 Cong. Rec. 24684, n. 1 (1972) (first emphasis in original; second emphasis added).

See also 120 Cong. Rec. 39992 (1974) (remarks of Sen. Bayh).

Then, in June 1974, HEW published proposed Title IX regulations pursuant to § 902. See 39 Fed. Reg. 22228 (1974). Included among these regulations was Subpart E, containing provisions prohibiting discriminatory employment practices in federally funded education programs. During the comment period, nearly 10,000 formal responses to the regulations were submitted, reputedly the most HEW had ever received on one of its proposals. See Salomone, Title IX and Employment Discrimination: A Wrong in Search of a Remedy, 9 J. Law & Ed. 433, 436 (1980). But not one suggested that § 901 was not meant to prohibit discriminatory employment practices. See 1975 Hearings 479 (statement of Peter E. Holmes, Director of the Office for Civil Rights).

On June 4, 1975, HEW published its final Title IX regulations, see 40 Fed. Reg. 24128 (1975), and, as required by § 431(d)(1) of the General Education Provisions Act, Pub. L. 93–380, 88 Stat. 567, as amended, 20 U. S. C. § 1232(d)(1), submitted the regulations to Congress for review. This "laying before" provision was designed to afford Congress an opportunity to examine a regulation and, if it found the regulation "inconsistent with the Act from which it derives its au-

thority . . . ," to disapprove it in a concurrent resolution. If no such disapproval resolution was adopted within 45 days, the regulation would become effective.

Resolutions of disapproval were introduced in both Houses of Congress. The two Senate resolutions, which did not mention the employment regulations, were not acted upon.[22] In the House, the Subcommittee on Postsecondary Education of the House Committee on Education and Labor held six days of hearings to determine whether the HEW regulations were "consistent with the law and with the intent of the Congress in enacting the law." 1975 Hearings 1 (remarks of Rep. O'Hara). One witness expressed opposition to the employment regulations, interpreting the legislative history much as petitioners have. *Id.*, at 406–408 (statement of Janet L. Kuhn); see also Kuhn, 65 Geo. L. J., at 49. Senator Bayh testified, however, that the regulations, "as the Congress mandated, call for equality in admissions . . . and in the case of teachers and other educational personnel, employment, pay and promotions." 1975 Hearings 169.[23] And HEW Secretary Weinberger stated that he did not see "any way you can find that employees do not participate in education programs and activities receiving Federal assistance, and, therefore, they are within the protected class . . . ." *Id.*, at 478. See also *id.*, at 140 (statement of Jean Simmons,

---

[22] Senator Laxalt introduced a resolution disapproving the regulations governing athletic programs. S. Con. Res. 52, 94th Cong., 1st Sess. (1975); see 121 Cong. Rec. 22940 (1975). Senator Helms' resolution was a blanket disapproval of the HEW regulations, S. Con. Res. 46, 94th Cong., 1st Sess. (1975); see 121 Cong. Rec. 17300 (1975), but he did voice disapproval specifically of the employment regulations when he introduced the resolution. *Id.*, at 17301. Senator Helms later explained that the Committee on Labor and Public Welfare had met in executive session on his resolution but had decided not to report it to the full Senate. *Id.*, at 23846.

[23] Senator Bayh also stressed the similarity between Title IX and Title VI, see 1975 Hearings 169–171, thereby confirming that his references to Title VI during the debate on his amendment did not indicate an intent that employment discrimination be excluded from its coverage.

President, Federation of Organizations for Professional Women); 154–155 (statement of Rep. Carr); 164 (statement of Rep. Mink); 329 (statement of Dr. Bernice Sandler, Director, Project of the Status and Education of Women, Association of American Colleges).

Following the hearings, members of the Subcommittee on Postsecondary Education introduced concurrent resolutions disapproving certain portions of the HEW regulations, but not referring specifically to the employment regulations. H. R. Con. Res. 329, 94th Cong., 1st Sess. (1975); H. R. Con. Res. 330, 94th Cong., 1st Sess. (1975); see 121 Cong. Rec. 21687 (1975). Representatives Quie and Erlenborn introduced an amendment to H. R. Con. Res. 330 that explicitly sought to disapprove the employment regulations as inconsistent with Title IX. See Unpublished Amendment to H. R. Con. Res. 330, quoted in 629 F. 2d, at 783.[24] Neither resolution was passed, and HEW's regulations went into effect on July 21, 1975.

Admittedly, Congress' failure to disapprove the HEW regulations does not necessarily demonstrate that it consid-

---

[24] H. R. Con. Res. 330 was referred to the House Committee on Education and Labor, which in turn submitted it to its Subcommittee on Equal Opportunities. That Subcommittee held a one-day hearing on the resolution, see Hearing on House Concurrent Resolution 330 (Title IX Regulation) before the Subcommittee on Equal Opportunities of the House Committee on Education and Labor, 94th Cong., 1st Sess. (1975) (H. R. Con. Res. 330 Hearing), and then voted to recommend against passage of the resolution. Interestingly, Representative O'Hara testified at this hearing, but, despite his remarks during the hearings conducted by his own Subcommittee, see 1975 Hearings 408–409, he did not challenge the employment regulations. See H. R. Con. Res. 330 Hearing 2–21, 33–34, 38.

In addition to the two concurrent resolutions mentioned in the text, Representative Martin introduced two resolutions in the House—one broad resolution disapproving all the Title IX regulations, H. R. Con. Res. 310, 94th Cong., 1st Sess. (1975); see 121 Cong. Rec. 19209 (1975), and one focusing on the sections governing athletic programs, H. R. Con. Res. 311, 94th Cong., 1st Sess. (1975); see 121 Cong. Rec. 19209 (1975). Neither referred to the employment regulations. No action was taken on the Martin resolutions.

ered those regulations valid and consistent with the legislative intent. See § 431(d)(1) of the General Education Provisions Act (as amended approximately four months after the Title IX regulations went into effect), 20 U. S. C. § 1232(d)(1). But the postenactment history of Title IX does indicate that Congress was made aware of the Department's interpretation of the Act and of the controversy surrounding the regulations governing employment, and it lends weight to the argument that coverage of employment discrimination was intended. See *Sibbach* v. *Wilson & Co.*, 312 U. S. 1, 14–16 (1941); Comment, 1976 B. Y. U. L. Rev., at 153–157. And the relatively insubstantial interest given the resolutions of disapproval that were introduced seems particularly significant since Congress has proceeded to amend § 901 when it has disagreed with HEW's interpretation of the statute.[25] While amending these other portions of § 901, however, Congress has not seen fit to disturb the Subpart E regulations.

In fact, Congress has refused to pass bills that would have amended § 901 to limit its coverage of employment discrimination. On the day the 45-day review period for the HEW regulations expired, Senator Helms introduced a bill that would have added a provision to Title IX stating that "[n]othing in [§ 901] shall apply to employees of any educational institution subject to this title." S. 2146, § 2(1), 94th Cong., 1st Sess. (1975); see 121 Cong. Rec. 23845–23847 (1975). No action was taken on the bill. Similarly, Senator McClure

---

[25] In 1974, Congress, by adding § 901(a)(6), excepted social fraternities and sororities and voluntary youth service organizations from the reach of § 901(a). Pub. L. 93–568, § 3(a), 88 Stat. 1862. See 120 Cong. Rec. 41390–41391 (1974) (remarks of Reps. Green, Steiger, Perkins, Quie, and Ashbrook). The amendment was enacted prior to the period of regulations review, but after HEW had published for comment the Title IX regulations, including those pertaining to employment practices. Then, in 1976, Congress added three new exceptions, §§ 901(a)(7)–(9). See 122 Cong. Rec. 27979–27987 (1976) (remarks of Sens. Fannin, Dole, Thurmond, Bayh, Humphrey, and Eagleton).

sponsored an amendment to S. 2657, 94th Cong., 2d Sess. (1976), the Education Amendments of 1976, which would have restricted the meaning of the term "educational program or activity" in § 901(a) to the "curriculum or graduation requirements of the institutions . . . ." receiving federal funds. 122 Cong. Rec. 28136 (1976). Senator Bayh successfully opposed the amendment, in part on the ground that it "would exempt those areas of traditional discrimination against women that are the reason for the congressional enactment of title IX[,]" including "employment and employment benefits . . . ." *Id.*, at 28144. The McClure amendment was rejected. *Id.*, at 28147.

Although postenactment developments cannot be accorded "the weight of contemporary legislative history, we would be remiss if we ignored these authoritative expressions concerning the scope and purpose of Title IX . . . ." *Cannon* v. *University of Chicago*, 441 U. S., at 687, n. 7. Where "an agency's statutory construction has been 'fully brought to the attention of the public and the Congress,' and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned." *United States* v. *Rutherford*, 442 U. S. 544, 554, n. 10 (1979), quoting *Apex Hosiery Co.* v. *Leader*, 310 U. S. 469, 489 (1940). See also *Cannon* v. *University of Chicago*, 441 U. S., at 702–703; *NLRB* v. *Bell Aerospace Co.*, 416 U. S. 267, 275 (1974); *United States* v. *Bergh*, 352 U. S. 40, 46–47 (1956). These subsequent events therefore lend credence to the Court of Appeals' interpretation of Title IX.[26]

## IV

Although we agree with the Second Circuit's conclusion that Title IX proscribes employment discrimination in feder-

---

[26] Petitioners' final two arguments rely on policy judgments: the school boards insist that the victims of employment discrimination have remedies other than those available under Title IX and that terminating all federal

ally funded education programs, we find that the Court of Appeals paid insufficient attention to the "program-specific" nature of the statute. The court acknowledged that, under § 902, termination of funds "shall be limited in its effect to the particular program, or part thereof, in which . . . noncompliance has been . . . found," but implied that the Department's authority to issue regulations is considerably broader. See 629 F. 2d, at 785–786.[27] We disagree.

It is not only Title IX's funding termination provision that

funds to an education program because of discrimination suffered by one employee will injure numerous innocent students. These policy considerations were for Congress to weigh, and we are not free to ignore the language and history of Title IX even were we to disagree with the legislative choice.

Moreover, even if alternative remedies are available and their existence is relevant, but cf. *Cannon* v. *University of Chicago*, 441 U. S., at 711; Comment, 129 U. Pa. L. Rev., at 442–446, this Court repeatedly has recognized that Congress has provided a variety of remedies, at times overlapping, to eradicate employment discrimination. See, *e. g.*, *Electrical Workers* v. *Robbins & Myers, Inc.*, 429 U. S. 229, 236–239 (1976); *Johnson* v. *Railway Express Agency, Inc.*, 421 U. S. 454, 459 (1975); *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36, 47–49 (1974). And petitioners do not dispute that all funds may be terminated for an education program that discriminates against only one *student*.

Similarly, the views of the dissent as to the competence of the drafters of Title IX, the need for the legislation, the type of procedural, remedial, and enforcement provisions that should have been included, and the language that should have been used, see *post*, at 551–555, may be interesting, and may be the sorts of considerations that Congress should take into account in enacting legislation; but they are not relevant to the inquiry we must undertake in ascertaining legislative intent. Rather, in order to avoid the oft-criticized practice of second-guessing Congress, we must rely on the legislative history, however "truncated," *post*, at 551, and not on our perceptions of the soundness of the legislative judgment.

[27] To the extent that the Court of Appeals was suggesting only that regulations may be broadly worded and need not be directed at specific programs—as long as they are applied only to programs that receive federal funds—we do not dispute the court's conclusion. See § 902 (referring to "rules, regulations, or orders of general applicability").

is program-specific. The portion of § 902 authorizing the issuance of implementing regulations also provides:

> "Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity . . . is authorized and directed to effectuate the provisions of section 901 *with respect to such program or activity* by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." (Emphasis added.)

Certainly, it makes little sense to interpret the statute, as respondents urge, to authorize an agency to promulgate rules that it cannot enforce. And § 901(a) itself has a similar program-specific focus: it forbids gender discrimination "under any education program or activity receiving Federal financial assistance . . . ."

Title IX's legislative history corroborates its general program-specificity. Congress failed to adopt proposals that would have prohibited *all* discriminatory practices of an institution that receives federal funds. See 117 Cong. Rec. 30155–30157, 30408 (1971) (Sen. Bayh's 1971 amendment); H. R. 5191, 92d Cong., 1st Sess., § 1001(b) (1971) (administration proposal); 1970 Hearings 690–691 (Dept. of Justice's proposed alternative to § 805 of H. R. 16098); cf. Title IX, § 904 (proscribing discrimination against the blind by a recipient of federal assistance with no program-specific limitation). In contrast, Senator Bayh indicated that his 1972 amendment, which in large part was ultimately adopted, was program-specific. See 118 Cong. Rec. 5807 (1972) (observing that the amendment "prohibit[s] discrimination on the basis of sex in federally funded education programs," and that "[t]he effect of termination of funds is limited to the particular entity and program in which such noncompliance has been found . . ."); cf. 117 Cong. Rec. 39256 (1971) (colloquies be-

tween Reps. Green and Waggoner and between Reps. Green and Steiger).

Finally, we note that language in §§ 601 and 602 of Title VI, virtually identical to that in §§ 901 and 902 and on which Title IX was modeled, has been interpreted as being program-specific. See *Board of Public Instruction* v. *Finch*, 414 F. 2d 1068 (CA5 1969). We conclude, then, that an agency's authority under Title IX both to promulgate regulations and to terminate funds is subject to the program-specific limitation of §§ 901 and 902. Cf. *Cannon* v. *University of Chicago*, 441 U. S., at 690–693.

Examining the employment regulations with this restriction in mind, we nevertheless reject petitioners' contention that the regulations are facially invalid. Although their import is by no means unambiguous, we do not view them as inconsistent with Title IX's program-specific character. The employment regulations do speak in general terms of an educational institution's employment practices, but they are limited by the provision that states their general purpose: "to effectuate title IX . . . [,] which is designed to eliminate (with certain exceptions) discrimination on the basis of sex in any education *program or activity* receiving Federal financial assistance . . . ." 34 CFR § 106.1 (1980) (emphasis added).[28]

HEW's comments accompanying publication of its final Title IX regulations confirm our view that Subpart E is consistent with the Act's program-specificity.[29] The Depart-

---

[28] Similarly, for example, the specific Title IX regulations governing student admissions policies—which are indisputably covered by the statute—are phrased generally, providing that "[n]o person shall, on the basis of sex, be denied admission, or be subjected to discrimination in admission, by any recipient . . . ." 34 CFR § 106.21(a) (1980). The reach of those regulations is likewise limited by § 106.1 to conform to Title IX's program-specific nature. See also 45 CFR § 80.3(b)(1) (1980) (Title VI regulation providing that "[a] recipient under any program to which this part applies may not . . . [discriminate] on ground of race, color, or national origin . . .").

[29] In construing regulations, the Court normally defers to the agency's interpretation. See, *e. g., INS* v. *Stanisic*, 395 U. S. 62, 72 (1969); *Udall* v.

ment recognized that § 902 limited its authority to terminate funds to particular programs that were found to have violated Title IX, and it continued:

"Therefore, an education program or activity or part thereof operated by a recipient of Federal financial assistance administered by the Department will be subject to the requirements of this regulation if it [30] receives or benefits from such assistance. This interpretation is consistent with the only case specifically ruling on the language contained in title VI, which holds that Federal funds may be terminated under title VI upon a finding that they 'are infected by a discriminatory environment . . .' *Board of Public Instruction of Taylor County, Florida* v. *Finch*, 414 F. 2d 1068, 1078–79 (5th Cir. 1969)." 40 Fed. Reg. 24128 (1975).

By expressly adopting the Fifth Circuit opinion construing Title VI as program-specific, HEW apparently indicated its intent that the Title IX regulations be interpreted in like fashion. So read, the regulations conform with the limitations Congress enacted in §§ 901 and 902.

Whether termination of petitioners' federal funds is per-

---

*Tallman*, 380 U. S. 1, 16–17 (1965). Here, however, that interpretation has fluctuated from case to case, and even as this case has progressed. See Brief for Federal Respondents 46; compare 1975 Hearings 485 (testimony of HEW Secretary Weinberger), and *Dougherty Cty. School System* v. *Harris*, 622 F. 2d, at 737, with Brief for Federal Respondents 44–46. Accordingly, there is no consistent administrative interpretation of the Title IX regulations for us to evaluate. Cf. n. 12, *supra*.

[30] Whether "it" refers to "recipient" or "education program or activity" is somewhat unclear, but we find the latter reading more plausible, especially given the approving citation to the Fifth Circuit's opinion in *Board of Public Instruction of Taylor County, Florida* v. *Finch*, 414 F. 2d 1068 (1969). Moreover, "a recipient of Federal financial assistance" by definition "receives or benefits from such assistance," whereas "an education program or activity . . . operated by a recipient" may not; the subordinate clause therefore adds nothing unless "it" means "program or activity." See also 34 CFR § 106.51(a) (1980) (prohibiting gender discrimination "under any education program or activity operated by a recipient *which* receives or benefits from Federal financial assistance" (emphasis added)).

missible under Title IX is a question that must be answered by the District Court in the first instance. Similarly, we do not undertake to define "program" in this opinion. Neither of the cases before us advanced beyond a motion for summary judgment, and the record therefore does not reflect whether petitioners' employment practices actually discriminated on the basis of gender or whether any such discrimination comes within the prohibition of Title IX. Neither school board opposed HEW's investigation into its employment practices on the grounds that the complaining employees' salaries were not funded by federal money, that the employees did not work in an education program that received federal assistance, or that the discrimination they allegedly suffered did not affect a federally funded program.[31] Instead, petitioners disputed the Department's authority to regulate any employment practices whatsoever, and the District Court adopted that view, which we find to be error. Accordingly, we affirm the judgment of the Court of Appeals but remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE POWELL, with whom THE CHIEF JUSTICE and JUSTICE REHNQUIST join, dissenting.

Title IX of the Education Amendments of 1972, 86 Stat. 373, as amended, 20 U. S. C. § 1681 *et seq.*, prohibits discrimination on the basis of sex in education programs and activities receiving federal funds. In 1975, the Department of Health, Education, and Welfare (HEW)[1] promulgated regulations prohibit-

---

[31] Petitioner North Haven, for example, has conceded that it uses a substantial percentage of its federal funds to pay the salaries of its employees, including teachers. See App. 6, 18–20, 21–22, 24.

[1] As noted by the Court, *ante*, at 516, n. 4, HEW's duties under Title IX were transferred to the Department of Education in 1979 by § 301(a)(3) of the Department of Education Organization Act, Pub. L. 96–88, 93 Stat. 678, 20 U. S. C. § 3441(a)(3) (1976 ed., Supp. IV). I follow the Court in referring to both agencies as HEW since many of the relevant acts in this case took place before the reorganization. See *ante*, at 516, n. 4.

ing discrimination on the basis of gender in *employment* by fund recipients. 34 CFR § 106.51(a)(1). Today, the Court upholds the validity of these regulations, relying on the statutory language, its legislative history, and several post-enactment events. Because I believe the Court's interpretation is neither consistent with the statutory language nor supported by its legislative history, I dissent.[2]

I

Although the Court begins with the language of the statute, it quotes the relevant language in its entirety only in the opening paragraphs of the opinion. In the section considering the statute's meaning, the Court quotes two words of the statute and paraphrases the rest, thereby suggesting an interpretation actually at odds with the language used in the statute. Thus, according to the Court, "[s]ection 901(a)'s broad directive that 'no person' may be discriminated against on the basis of gender appears, on its face, to include employees as well as students." *Ante*, at 520. This is not what the statutory language provides.

In relevant part, the statute states:

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." Education Amendments of 1972, § 901(a), 20 U. S. C. § 1681(a).

A natural reading of these words would limit the statute's scope to discrimination against those who are enrolled in, or who are denied the benefits of, programs or activities receiving federal funding. It tortures the language chosen by Congress to conclude that not only teachers and administrators, but also secretaries and janitors, who are discriminated against on the basis of sex in employment, are thereby (i) de-

---

[2] The Court acknowledges that the postenactment events it discusses only "lend credence" to its interpretation of the statute. *Ante*, at 535.

nied *participation* in a program or activity;[3] (ii) denied the *benefits* of a program or activity; or (iii) subject to discrimination *under* an education program or activity. Moreover, Congress made no reference whatever to employers or employees in Title IX, in sharp contrast to quite explict language in other statutes regulating employment practices.[4]

It is noteworthy that not one of the other five Courts of Appeals to consider the question before us reached the conclusion that HEW's interpretation is supported by the statutory language. The issue was presented initially to the Court of Appeals for the First Circuit in *Islesboro School Committee* v. *Califano*, 593 F. 2d 424, 426, cert. denied, 444 U. S. 972 (1979), and that decision has been followed by most other Courts of Appeals to consider the question. There, the court concluded that "[t]he language of section 901, 20 U. S. C. § 1681(a), on its face, is aimed at the beneficiaries of the federal monies, *i. e.*, either students attending institutions receiving federal funds or teachers engaged in special research being funded by the United States government." The court went on to point out that this reading of "the plain language of the statute is buttressed by an examination of the specific exemptions mentioned in the statute," all of which relate to students, not employees.[5] *Ibid.*

---

[3] I agree with the Court that employees who directly participate in a federal program, *i. e.*, teachers who receive federal grants, are, of course, protected by Title IX. See *ante*, at 520–521. Respondents Elaine Dove and Linda Potz were not, however, participants in any grant program or in any other federally funded program or activity. Elaine Dove was a teacher and Linda Potz a guidance counselor. Both alleged only discrimination in employment.

[4] See, *e. g.*, 42 U. S. C. § 2000e–2(a) (Title VII: "[i]t shall be an unlawful employment practice for an employer—"); 29 U. S. C. § 206(d)(1) (Equal Pay Act: "[n]o employer having employees . . .").

[5] The Court today not only finds this point unconvincing, but concludes that the "absence of a specific exclusion for employment among the list of exceptions tends to support the Court of Appeals' conclusion" that Title IX does protect employees. *Ante*, at 521–522. I am unable to follow this reasoning. The absence of employment-related exceptions may not be

In the next appellate decision, *Romeo Community Schools* v. *HEW*, 600 F. 2d 581, cert. denied, 444 U. S. 972 (1979), the Court of Appeals for the Sixth Circuit also rejected the interpretation of the statute now relied on by this Court, noting: "[A]s actually written, the statute is not nearly so broad. The words 'no person' are modified by later language which clearly limits their meaning." 600 F. 2d, at 584. The court concluded that the statute "reaches only those types of disparate treatment" that involve discrimination against program beneficiaries.[6] *Ibid.*

---

conclusive proof that employment is not within the scope of the statute. But I fail to see how that absence affirmatively indicates that the statute was intended to apply to employees. Indeed, if Congress did intend to cover employees, it is anomalous that it did not provide exceptions similar to those in Title VII. For example, Title VII does not proscribe bona fide seniority plans, 42 U. S. C. § 2000e–2(h).

[6] The question also has been presented to the Courts of Appeals for the Fifth, Eighth, and Ninth Circuits. In *Junior College Dist. of St. Louis* v. *Califano*, 597 F. 2d 119, 121, cert. denied, 444 U. S. 972 (1979), the Court of Appeals for the Eighth Circuit considered HEW's arguments but "adopted" the Court of Appeals for the First Circuit's decision in *Islesboro*. And in *Seattle University* v. *HEW*, 621 F. 2d 992, 993, cert. granted *sub nom. United States Dept. of Ed.* v. *Seattle Univ.*, 449 U. S. 1009 (1980), the Court of Appeals for the Ninth Circuit followed the three earlier Circuit decisions, noting that each of those courts had held that the plain language of Title IX did not support HEW's position. Even in the decision below, in which the Court of Appeals for the Second Circuit upheld the regulations, the court did not base its decision on the statutory language, and stated that the "language is more ambiguous than HEW suggests." 629 F. 2d 773, 777.

The other appellate decision was entered by the Court of Appeals for the Fifth Circuit in *Dougherty Cty. School System* v. *Harris*, 622 F. 2d 735 (1980), cert. pending *sub nom. Bell* v. *Dougherty Cty. School System*, No. 80–1023. There, the Court of Appeals for the Fifth Circuit held the regulations invalid because they did not limit fund termination to the offending program or activity. In reaching this decision, the court noted that program-specific regulations might be sustainable in some instances, *e. g.*, if they prohibited discrimination in pay against female teachers paid with federal funds relative to the amounts paid male teachers with federal funds. The court noted that an argument can be made that in such a case,

II

A

The Court acknowledges, as it must, that § 901 of Title IX "does not expressly include . . . employees." But it finds a strong negative inference in the fact that § 901 does not "exclude employees from its scope." *Ante*, at 522. The Court then turns to the legislative history for evidence as to whether or not § 901 was meant to prohibit employment discrimination. *Ibid.* I agree with the several Courts of Appeals that have concluded unequivocally that the statutory language cannot fairly be read to proscribe employee discrimination. Only rarely may legislative history be relied upon to read into a statute operative language that Congress itself did not include. To justify such a reading of a statute, the legislative history must show clearly and unambiguously that Congress did intend what it failed to state.[7] The Court's elaborate exposition of the history of Title IX falls far short of this standard.

Title IX originated in a floor amendment sponsored by Senator Bayh to Senate bill S. 659, 92d Cong., 2d Sess. (1972). The amendment was intended to close loopholes in earlier civil rights legislation; three problem areas had been identified in hearings by a special House Committee in 1970. See Discrimination Against Women: Hearings on Section 805 of H. R. 16098 before the Special Subcommittee on Education of the House Committee on Education and Labor, 91st

---

the woman teacher is "denied the benefits of" or "subject to discrimination under" the federal program. 622 F. 2d, at 737–738. But there is no indication it would agree with this Court that the statutory language supports program-specific regulations prohibiting all kinds of discriminatory employment practices with respect to all types of employees, *i. e.*, hourly employees, secretaries, and administrators as well as teachers.

[7] See, *e. g.*, *Citizens to Preserve Overton Park* v. *Volpe*, 401 U. S. 402, 412, n. 29 (1971) ("Because of this ambiguity [in the legislative history] it is clear that we must look primarily to the statutes themselves to find the legislative intent").

Cong., 2d Sess. (1970). Title VII of the Civil Rights Act of 1964, though generally barring employment discrimination on the basis of sex, race, religion, or national origin, did not apply to discrimination "with respect to the employment of individuals to perform work connected with the educational activities of [educational] institutions." Pub. L. 88–352, Title VII, § 702, 78 Stat. 255. And the Equal Pay Act of 1963 banned discrimination in wages on the basis of sex, 29 U. S. C. § 206(d)(1), but it did not apply to administrative, executive, or professional workers, including teachers. See 29 U. S. C. § 213(a)(1) (1970 ed.) (no longer in force). Finally, Title VI of the Civil Rights Act of 1964, 42 U. S. C. § 2000d, barred discrimination on the basis of "race, color, or national origin," but not sex, in any federally funded programs and activities.

The Bayh floor amendment, No. 874, introduced in 1972, 118 Cong. Rec. 5803 (1972) (print of amendment), closed these loopholes. Section 1005 amended Title VII to cover employment discrimination in educational institutions. *Ibid.* Sections 1009–1010 amended the Equal Pay Act so that discrimination in pay on the basis of sex was barred, even for teachers and other professionals. *Ibid.* And §§ 1001–1003 created a new Title IX banning discrimination on the basis of sex in federally funded *educational* programs and activities, thus effectively extending Title VI's prohibition to sex discrimination in such programs.

Since the amendments to Title VII and the Equal Pay Act explicitly covered discrimination in employment in educational institutions, there was no need to include §§ 1001–1003 of the Bayh amendment to proscribe such discrimination. Instead, Title IX presumably was enacted, as its language clearly indicates, to bar discrimination against beneficiaries of federally funded educational programs and activities. This interpretation of Title IX is confirmed by the fact that it was modeled after Title VI, a statute limited in its scope to

discrimination against beneficiaries of federally funded programs, not general employment practices of fund recipients.[8] 42 U. S. C. § 2000d–3.[9]   And, as this Court noted in *Cannon* v. *University of Chicago*, 441 U. S. 677, 694–701 (1979), when Congress passed Title IX, it expected the new provision to be interpreted consistently with Title VI, which had been its model.

B

The Court discounts the importance of Title VI to the proper interpretation of Title IX for three reasons.   First, it notes that "[i]t is Congress' intention in 1972, not in 1964, that is of significance in interpreting Title IX."   *Ante,* at 529 (citing *Cannon* v. *University of Chicago, supra,* at 710–711). This point begs the question, however, since there is no evidence that in 1972, when it passed Title IX, Congress thought Title VI applied to employment discrimination.   The second reason advanced by the Court for disregarding Title VI is that it, unlike Title IX, includes a section, *i. e.,* § 604, 42 U. S. C. § 2000d–3, expressly stating that Title VI applies only to discrimination against fund beneficiaries, not to employment discrimination *per se.*   But in an earlier version of the legislation that was to become Title IX, the amendment was drafted as a modification of Title VI, simply adding the word "sex."   In the end, it is true, Title IX was enacted as a statute separate from Title VI, but the reason for this approach was strategic, not substantive.   Supporters feared that if Title VI were opened for amendment,

---

[8] The operative language in the two provisions is virtually identical. Compare 42 U. S. C. § 2000d (Title VI) with 20 U. S. C. § 1681(a) (Title IX).

[9] Title 42 U. S. C. § 2000d–3 states:

"Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency or labor organization except where a primary objective of the Federal financial assistance is to provide employment."

Title VI itself might be "gutted" on the floor of the Congress. Sex Discrimination Regulations: Review of Regulations to Implement Title IX, Hearings Before the Subcommittee on Postsecondary Education and Labor of the House Committee on Education and Labor, 94th Cong., 1st Sess., 409 (1975) (1975 Hearings).

Finally, to break the link between Titles VI and IX, the Court stresses that the House version of the Senate's Bayh amendment originally contained a provision, § 1004, equivalent to § 604 of Title VI, explicitly stating that no section of the 1972 legislation applied to discrimination in employment, but this provision was eliminated by the Conference. *Ante*, at 527–528. A strong argument, however, can be made that there was a nonsubstantive reason for eliminating § 1004 from the House bill. In 1975 hearings before the House Subcommittee on Postsecondary Education and Labor, Representative O'Hara, Chairman of that Subcommittee, while explaining the background of Title IX to a witness, noted that this change was made at Conference simply to eliminate, as quietly as possible, a recently discovered drafting error. 1975 Hearings 409. Even without reference to Representative O'Hara's remarks, made in 1975, it is clear that, at the time of the Conference on the House bill and the Senate's Bayh amendment, § 1004 of the House bill was a drafting mistake; it stated that no section of the House bill applied to employment, though sections of the House bill, as well as the Senate version, contained express changes to the employment discrimination provisions of Title VII and the Equal Pay Act. Since the analogous provision of Title VI, § 604, had been regarded as a mere clarification,[10] the Court is on weak ground in arguing that the Conference Report's use of the ritualistic words "the House recedes" reveals a substan-

---

[10] See, *e. g.*, 110 Cong. Rec. 10076 (1964) (statement of Attorney General Kennedy); Civil Rights: Hearings on H. R. 7152 before the House Committee on Rules, 88th Cong., 2d Sess., 198 (1964) (statement of Cong. Celler, House Floor Manager of Title VI).

tive change rather than the quiet correction of an obvious drafting error at a very late stage in the legislative process.

## C

In concluding that the legislative history indicates Title IX was intended to extend to employment discrimination, the Court is forced to rely primarily on the statements of a single Senator.[11] The first statement, *ante*, at 524 (quoting 118 Cong. Rec. 5803 (1972)), is ambiguous. Senator Bayh did state that faculty employment would be covered by his amendment after mentioning the sections enacting Title IX but *prior* to any mention of those amending Title VII and the Equal Pay Act. Immediately thereafter, however, he stated that Title IX's enforcement powers paralleled those in Title VI. Yet Title VI has never provided for fund termination to redress discrimination in employment.

Next, the Court quotes Bayh's statements that (i) he regarded "sections 1001–1005" as "[c]entral to [his] amendment" and (ii) "[t]his portion of the amendment covers discrimination in all areas," including employment. *Ante*, at 525 (quoting 118 Cong. Rec. 5807 (1972)). But § 1005 of the Bayh amendment is the section amending Title VII and thus §§ 1001–1005 cover employment discrimination regardless of whether Title IX does.[12] Moreover, the Court uses an ellip-

---

[11] The most dependable sources of legislative intent are the reports of the responsible committees. Because Title IX is the result of a floor amendment, there is no explanation of its meaning in reports from the relevant House and Senate Committees.

[12] See description of various sections of the Bayh amendment, *supra*, at 545. See also 118 Cong. Rec. 5803 (1972) (print of amendment).

The Court argues against the relevance of the portion of Senator Bayh's statement that is inconsistent with its position, characterizing that portion as "inadvertent." See *ante*, at 526, n. 15. This hardly gives one confidence that the Senator's statements, selectively relied upon by the Court, are not also inadvertent. Moreover, the Court's decision concededly is

sis rather than include the following words from the second Bayh statement:

> "Discrimination against the beneficiaries of federally assisted programs and activities is already prohibited by title VI of the 1964 Civil Rights Act, but unfortunately the prohibition does not apply to discrimination on the basis of sex. In order to close this loophole, my amendment sets forth prohibition and enforcement provisions which generally parallel the provisions of title VI." 118 Cong. Rec. 5807 (1972) (in ellipsis, *ante*, at 525).

Thus, for a second time, Bayh indicated to the Senate that he regarded Title IX of his amendment as parallel to Title VI rather than as a substantial departure from Title VI.

In the third Bayh statement, *ante*, at 526 (quoting 118 Cong. Rec. 5812 (1972)), the Senator was responding to a question from Senator Pell regarding Title IX, and the Court assumes that each sentence in that response refers to Title IX. But, as the Court of Appeals for the First Circuit noted in *Islesboro:*

> "A fair reading both of the colloquy . . . , as well as the discussion immediately preceding and following the above-quoted passage, indicates that Senator Bayh divided his analysis into three sections, two of which were

---

based solely on discussion on the floor of the Senate. We note—as evidence of how little that discussion actually supports the Court—that the views of Courts of Appeals judges with respect to its import have ranged from viewing it as indicating *no intention* to include employment discrimination in Title IX to recognizing that, like most floor debates, the oral statements of Senators must be viewed with skepticism even when not ambiguous. See *Seattle University* v. *HEW,* 621 F. 2d, at 995; *Romeo Community Schools* v. *HEW,* 600 F. 2d 581, 585 (CA6), cert. denied, 444 U. S. 972 (1979); *Islesboro School Committee* v. *Califano,* 593 F. 2d 424, 428 (CA1), cert. denied, 444 U. S. 972 (1979).

specifically aimed at students (admissions and services), the third at employees (employment). While Senator Bayh's response was more extended than it needed to be for a direct answer to Senator Pell's question, we think HEW's reading is strained. We think this particularly in light of the fact that the discussion was an oral one and thus not as precise as a response in written form . . . ." 593 F. 2d, at 427.

Rather than supporting the Court's view, the legislative history accords with the natural reading of the statute. Title IX prohibits discrimination only against beneficiaries of federally funded programs and activities, not all employment discrimination by recipients of federal funds. Title IX is modeled after Title VI, which is explicitly so limited—and to the extent statements of Senator Bayh can be read to the contrary, they are ambiguous.[13]

As indicated above, when critical words, in this case "employment discrimination," are absent from a statute and its meaning is otherwise clear, reliance on legislative history to add omitted words is rarely appropriate. Only when legislative history gives clear and unequivocal guidance as to congressional intent should a court presume to add what Congress failed to include. And, however else one might describe the legislative history relied upon by the Court today, it is neither clear nor unequivocal.

---

[13] The Court devotes considerable time to describing postenactment actions or inaction on the part of subsequent Congresses. See *ante*, at 530–535. The fact that, in 1975, Congress considered, but failed to enact, resolutions disapproving HEW's regulations is essentially irrelevant in determining the intent of the enacting Congress in 1972. Similarly, the fact that a subsequent Congress considered, but failed to enact, bills limiting Title IX's coverage with respect to employment discrimination does not indicate that the 1972 Congress meant to include employment discrimination within Title IX.

## III

As the sole issue before us is the meaning of § 901(a) of Title IX, I repeat the relevant language:

"No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."

The Court acknowledges that, in view of the lack of support for its position in this language, it must look to the legislative history for evidence as to whether or not § 901 was meant to prohibit employment discrimination. *Ante,* at 522. Although the Court examines at length the truncated legislative history, it ignores other factors highly relevant to congressional intent: (i) whether the ambiguity easily could have been avoided by the legislative draftsman; (ii) whether Congress had prior experience and a certain amount of expertise in legislating with respect to this particular subject; and (iii) whether existing legislation clearly and adequately proscribed, and provided remedies for, the conduct in question. When these factors are considered, there is no justification for reading sex employment discrimination language into § 901.

If there had been such an intent, no competent legislative draftsman would have written § 901 as above set forth. The draftsman would have been guided, of course, by the employment-discrimination language in Title VII and the Equal Pay Act, language specifically addressing this problem. Moreover, although these other statutes had been enacted by an earlier Congress, at the time Title IX was being drafted and considered Title VII and the Equal Pay Act also were amended to proscribe explicitly employment discrimination in educational institutions on the basis of sex. Congress hardly would have enacted a *third* statute addressing this

problem, but, in contrast to the other two, use language ambiguous at best.

In addition, a comparison of the provisions of Title VII and Title IX suggests that Congress would not have enacted the inconsistent provisions of the latter with respect to remedies and procedures. Title VII is a comprehensive antidiscrimination statute with carefully prescribed procedures for conciliation by the EEOC, federal-court remedies available within certain time limits, and certain specified forms of relief, designed to make whole the victims of illegal discrimination and available unless discriminatory conduct falls within one of several exceptions. See 42 U. S. C. § 2000e *et seq.* (1976 ed. and Supp. IV). This thoughtfully structured approach is in sharp contrast to Title IX, which contains only one extreme remedy, fund termination, apparently now available at the request of any female employee who can prove discrimination in employment in a federally funded program or activity. This cutoff of funds, at the expense of innocent beneficiaries of the funded program, will *not* remedy the injustice to the employee. Indeed, Title IX does not authorize a single action, such as employment, reemployment, or promotion, to rectify *employment* discrimination. And Title IX, unlike Title VII, has no time limits for action, no conciliation provisions, and no guidance as to procedure.[14]

---

[14] It is interesting to note that, whereas Congress itself provided for administrative procedures to redress employment discrimination in Title VII, see 42 U. S. C. § 2000e *et seq.* (1976 ed. and Supp. IV), it enacted no comparable provisions in Title IX, see 20 U. S. C. § 1681 *et seq.* Such administrative procedures as are available under Title IX are part of the regulations promulgated by HEW, 45 CFR §§ 80.7–80.10 (1980).

The administrative procedures enacted by Congress in the United States Code and promulgated by HEW in the Code of Federal Regulations are quite different, though addressing a single problem. The HEW regulations provide for Administrative Procedure Act hearings, followed by judicial review. See 45 CFR §§ 80.9–80.11 (1980). In contrast, EEOC acts first as conciliator, attempting to settle employment disputes, and then, if it so desires, as counsel for the victims of discrimination in subsequent *de novo* judicial proceedings. See 42 U. S. C. § 2000e *et seq.* (1976 ed. and Supp. IV).

Compare 20 U. S. C. § 1681 *et seq.* (Title IX) with 42 U. S. C. § 2000e *et seq.* (1976 ed. and Supp. IV) (Title VII). The Solicitor General conceded at oral argument that appropriate relief for the two employees who initiated this suit was available under Title VII.[15]   See Tr. of Oral Arg. 27.

Finally, Congress delegated the administration of Title IX to the Department of HEW.   In contrast, Title VII and the Equal Pay Act are administered by the Department of Labor and EEOC.   It is most unlikely that Congress would intend not only duplicate substantive legislation but also enforcement of these provisions by different departments of government with different enforcement powers, areas of expertise, and enforcement methods.[16]   The District Court in *Romeo Community Schools* v. *HEW*, 438 F. Supp. 1021 (ED Mich. 1977), aff'd, 600 F. 2d 581 (CA6), cert. denied, 444 U. S. 972 (1979), correctly observed:

"These governmental agencies, particularly the EEOC, were established specifically for the purpose of regulating discrimination in employment practices.   These agencies have the expertise and their enabling legisla-

---

[15] An employee could presumably bring actions against the school district under Title VII and the Equal Pay Act, seeking redress of his or her wrong in the form of backpay and injunctive relief, and, in addition, request that funds be terminated under Title IX.

[16] The Court's decision will result in needless duplication of governmental bureaucracy.   Although HEW would prefer to have no involvement in employment discrimination, see Brief for Federal Respondents 37, n. 26, it will be required to maintain a staff of employees to enforce the antidiscrimination in employment portion of Title IX.   And these employees will duplicate the large staffs of the EEOC and the Department of Labor already devoted to employment discrimination.

From the viewpoint of educational institutions, there will now be two sets of federal regulations and regulators overseeing their employment practices.   These different governmental departments may, or may not, have the same substantive standards and filing requirements at any given time.   At the present time, the HEW and EEOC procedures in the event of noncompliance are quite different.   See discussion in text *supra,* at 552.

tion has provided them with the investigative and enforcement machinery necessary to compel compliance with regulations against sex discrimination in employment. HEW does not have similar enforcement authority." 438 F. Supp., at 1034.

Even the Solicitor General, in the brief on behalf of the federal respondents in this case, acknowledges what the *Romeo* court thought was self-evident:

"The Department of Education has only limited expertise in employment matters. Its view is that employment cases are better resolved under Title VII of the Civil Rights Act of 1964, which provides more appropriate remedies for such cases." Brief for Federal Respondents 37, n. 26.

In sum, the Court's decision today, finding an unarticulated intent on the part of Congress, is predicated on five perceptions of congressional action that I am unable to share: (i) that Congress neglectfully or forgetfully failed to include language in § 901 with respect to discrimination that would have made clear its intent; (ii) that Congress enacted a *third* statute proscribing sex discrimination in employment in educational institutions in the absence of any showing of a need for such duplicative legislation; (iii) that Congress failed to include in the third statute appropriate procedural and remedial provisions relevant to employment discrimination; (iv) that it vested the authority to enforce the third statute in HEW, a department that even the Solicitor General concedes lacks the experience and the qualifications to oversee and enforce employment legislation; and finally (v) that in Title IX, it gave a new "remedy" for sex discrimination in employment, but did not make that remedy available to those discriminated against on the basis of race.

In response to this dissent, see *ante*, at 536, n. 26, the Court states that the factors considered in this Part III, summarized above, "are *not* relevant" to "ascertaining legislative

intent." If this were a "plain language" case, this statement probably would be unobjectionable. But the Court recognizes that its position cannot be sustained solely by the plain language of the statute, and it therefore relies heavily on ambiguous and muddled oral statements made on the floor of the Senate. In these circumstances, it defies reason to say that a court should not consider what reasonable legislators surely would have considered. Where ambiguity exists it is not "irrelevant," to the process of ascertaining the intention of Congress, to consider specifically other statutes on the same subject. Nor must a court shun common sense in resolving ambiguities.[17]

---

[17] See, *e. g.*, *Buckley* v. *Valeo*, 424 U. S. 1, 77 (1976) (when statute is ambiguous, Court must "draw upon 'those common-sense assumptions that must be made in determining direction without a compass'") (citation omitted); *Fairport R. Co.* v. *Meredith*, 292 U. S. 589, 595 (1934) (the interpretation that a reasonable Congress would have intended is adopted by the Court); 2A C. Sands, Sutherland on Statutory Construction § 456.12, p. 38 (4th ed. 1973) (legislative bodies presumed to act reasonably). See also *Kokoszka* v. *Belford*, 417 U. S. 642, 650 (1974) ("When 'interpreting a statute, the court will look not merely to a particular clause in which general words may be used, but will take in connection with it the whole statute (or statutes on the same subject) and the objects and policy of the law . . .'").