# The Secretary of Transportation's Continued Authority to Sell the Consolidated Rail Corporation Under the Regional Rail Reorganization Act in Light of *INS* v. *Chadha,* 462 U.S. 919 (1983)

The legislative veto provisions of the Regional Rail Reorganization Act, 45 U.S.C. §§ 761(a)(3), 767(d), which purport to condition the Secretary of Transportation's authority to sell Consolidated Rail Corporation (Conrail) as an entity or by sale of assets, are unconstitutional under the Supreme Court's decision in *INS* v. *Chadha,* 462 U.S. 919 (1983). Nonetheless, the Secretary of Transportation continues to have authority to sell Conrail, either as an entity or by sale of assets, because the unconstitutional veto provisions are severable from the rest of the statute.

The severability of an unconstitutional provision from the remainder of the statute is determined by analyzing whether Congress would have enacted the remainder of the statute had it recognized that the questioned provisions were unconstitutional.

The presence of a severability clause in the Regional Rail Reorganization Act creates a strong presumption that Congress intended that any unconstitutional provisions be severable from the remainder of the statute. The legislative veto provisions are further presumed severable because the Secretary's sale authority remains "fully operative as a law" without the legislative veto provisions. The legislative history, taken as a whole, also suggests that Congress would have wanted the Secretary of Transportation to exercise the sale authority even without the legislative vetoes, and thus provides insufficient evidence to rebut the presumption of severability created by the severability clause and the otherwise "fully operative" statutory scheme.

September 16, 1983

MEMORANDUM OPINION FOR THE SECRETARY OF TRANSPORTATION

This memorandum responds to your request for our view whether the Secretary of Transportation (Secretary) continues to have authority to sell the Consolidated Rail Corporation (Conrail) under the Regional Rail Reorganization Act of 1973, as amended, 45 U.S.C. §§ 701 *et seq.* (3R Act), either as an entity, *see* 45 U.S.C. § 761, or by sale of assets ("freight transfer agreements"), see 45 U.S.C. § 765, in light of the recent Supreme Court decision in *INS* v. *Chadha,* 462 U.S. 919 (1983). Because the Secretary's authority to sell Conrail as an entity is subject to a two-House veto provision, *see* 45 U.S.C. § 761(d)(3), that is unconstitutional under *United States Senate* v. *FTC,* 463 U.S. 1216 (1983) (summary affirmance), and the authority to sell Conrail by freight transfer agreements is subject to a one-House veto that is unconstitutional under the analysis set forth in *Chadha,* you have asked us to determine whether the

153

Secretary's underlying sale authority remains valid. You have also noted that, in light of the *Chadha* decision, the leadership of the House Committee on Energy and Commerce and its Subcommittee on Transportation has initiated legislation that would replace both legislative veto provisions with the requirement that Congress affirmatively enact into law any sale plan arranged by the Secretary. For the reasons set forth below, we conclude that the legislative veto provisions are severable and that there is no constitutional impediment to the Secretary's continued authority to sell Conrail either as an entity or by sale of assets.

## I. Background

In 1981, Congress enacted the Northeast Rail Service Act of 1981, a subtitle of Title XI of the Omnibus Budget Reconciliation Act of 1981. *See* Pub. L. No. 97–35, 95 Stat. 357, 643 (1981). Section 1142 of the subtitle amended the 3R Act of 1973 by inserting a new Title IV that authorizes the Secretary to arrange for the sale of the common stock of Conrail or to engage in freight transfer agreements. Pursuant to the legislative scheme, the Secretary shall, as soon as practicable, engage the services of an investment banking firm to arrange for the sale of the interest of the United States in the common stock of Conrail. *See* 45 U.S.C. § 761(a)(1). The Secretary may submit a stock sale plan to Congress if that plan ensures continued rail service, promotes competitive bidding for the common stock, and maximizes the return to the United States on its investment. *See id.* § 761(a)(2). A plan that meets these requirements is deemed approved sixty days after its submission to Congress, unless both Houses pass a concurrent resolution disapproving the plan. *See id.* § 761(a)(3).

Congress also required the Board of Directors of the United States Railway Association (USRA Board) to make a prospective determination on June 1, 1983 whether Conrail will be a profitable carrier. *See id.* § 763.[1] If the USRA Board determines that Conrail will be profitable, the Secretary is to continue pursuit of the stock sale plan. If the USRA Board determines that Conrail will not be a profitable carrier, the Secretary is authorized to initiate negotiations for the transfer of Conrail's properties and service responsibilities. *See id.* § 763(a)(3)(A), (B). Because the USRA Board found Conrail profitable on June 1, 1983, the Secretary is continuing to pursue the sale of Conrail as an entity.

Once Conrail meets the initial profitability test, the USRA Board is required to make a historically based determination whether Conrail has been profitable from June 1 to October 31, 1983. *See id.* § 763(b)(1). Again, if the USRA Board finds that Conrail has been a profitable carrier, the Secretary must continue to pursue the sale of Conrail as an entity at least until June 1, 1984. If the USRA Board finds that Conrail has not been a profitable carrier, the Secretary is authorized to negotiate freight transfer agreements to sell Conrail

---

[1] The United States Railway Association (USRA) is a nonprofit association authorized to monitor the financial performance of Conrail and to review whether certain goals, such as the creation through reorganization of a financially self- sustaining regional rail system, are met. *See* 45 U.S.C. §§ 711–719.

in pieces. *See id.* § 763(b)(3)(A), (B). After June 1, 1984, the Secretary may notify the USRA Board that she is unable to sell Conrail as an entity, and if the USRA Board approves the Secretary's determination then the employees have 90 days within which to submit a stock purchase plan. Thereafter, if no employee stock purchase plan is approved, the Secretary is authorized to negotiate for the transfer of Conrail in pieces. If the USRA Board does not concur in the Secretary's June 1, 1984, determination, however, the procedure for continuing to sell Conrail as an entity and, if unsuccessful, seeking approval for authority to negotiate freight transfer agreements is repeated every ninety days. *See id.* § 764; 127 Cong. Rec. 19505 (1981) (Explanatory Statement of Conferees on Title XI of Omnibus Budget Reconciliation Bill as provided for in the House Conference Report).

The Secretary's authority to negotiate for the transfer of Conrail's rail properties and service responsibilities, once triggered by the requisite prior conditions, *see* 45 U.S.C. § 765(a), is carefully circumscribed by congressionally defined goals and provisions for consultation and review. The Secretary must consult, among others, railroads, employee representatives, State and local government officials, shippers, consumer representatives, and potential purchasers. *See id.* § 765(b), (d). The Secretary must ensure that no less than 75 percent of Conrail's rail service operations are maintained under the aggregate of the freight transfer agreements and that the agreements provide for the long term viability of the acquiring private sector railroads and the enhancement of competition. *See id.* § 766. After preliminary approval of the freight transfer agreements the Secretary shall request public comment for at least thirty days; the Attorney General must then advise the Secretary within ten days whether the agreements are inconsistent with the antitrust laws, and the Interstate Commerce Commission (ICC) during the same time period must advise the Secretary of the effect of the agreements on the adequacy of public transportation and railroad competition. *See id.* § 767(a), (b). Finally, after any modifications in light of the above described comments and advice, the Secretary may grant final approval to the freight transfer agreements subject to a one-House resolution of disapproval within sixty days of transmittal of the freight transfer agreements to Congress. *See id.* § 767(d).

## II. Severability

Whether the Secretary continues to have authority to sell Conrail as an entity under 45 U.S.C. § 761 in the absence of the two-House veto provision in § 761(a)(3) depends on whether that provision of § 761(a)(3) is severable from the remainder of § 761. Similarly, whether the Secretary has authority to approve freight transfer agreements for the sale of Conrail's rail properties under 45 U.S.C. §§ 765–767 depends on whether the disapproval provision in § 767(d) is severable from the rest of these statutory provisions. Determining the severability of an unconstitutional provision from the remainder of a statute requires an "elusive inquiry" into legislative intent: whether Congress would

have enacted the remainder of the statute had it recognized that the questioned provisions were unconstitutional and therefore could not have properly been included in the statute. *See United States* v. *Jackson,* 390 U.S. 570 (1968); *Dorchy* v. *Kansas,* 264 U.S. 286, 290 (1924); *Consumer Energy Council of America* v. *FERC,* 673 F.2d 425, 442 (D.C. Cir. 1982), *aff'd mem. sub nom. Process Gas Consumers Group v. Consumer Energy Council,* 463 U.S. 1216 (1983). The invalid portions are to be severed "unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not." *INS* v. *Chadha,* 462 U.S. at 931–32 (quoting *Buckley* v. *Valeo,* 424 U.S. 1, 108 (1976)). In the present case, we must attempt to determine which of two basic options Congress would have chosen. Congress could have decided to authorize the Secretary to sell Conrail, either as an entity or by sale of assets, absent the opportunity for a legislative veto; alternatively, Congress could have refused to authorize the Secretary to sell Conrail in the absence of a provision for legislative review.

In *INS* v. *Chadha,* the Court analyzed the severability question by discerning certain statutory characteristics that create a presumption of severability and by examining the legislative history to determine whether it was sufficient to rebut those presumptions. First, the presence of a severability clause "plainly authorized" the presumption that Congress intended that any unconstitutional provision be severable from the remainder of the statute. *See* 462 U.S. at 932. In the present instance, there is a severability clause, which was contained in the original legislation, the 3R Act of 1973. *See* 45 U.S.C. § 701 note.[2] This clause, which is virtually identical to the severability provision at issue in *Chadha,* provides that: "If any provision of this Act . . . or the application thereof to any person or circumstances is held invalid, the remainder of this Act and the application of such provision to other persons or circumstances shall not be affected thereby." Although the Omnibus Budget Reconciliation Act of 1981, which enacted the relevant provisions governing the sale of Conrail, does not contain a severability provision, it is significant that the 1981 statute specifically provides that the Conrail sale provisions amend the 3R Act of 1973. *See* Pub. L. No. 97–35, § 1142, 95 Stat. 654 (1981) ("The Regional Rail Reorganization Act of 1973 is amended by inserting immediately after Title III the following new title: 'Title IV Transfer of Freight Service'"). Because Congress was clearly aware that the 1981 amendments were to become a part of the 3R Act of 1973, we must presume that Congress understood that the original severability clause was fully applicable to the more recent statutory additions. *Cf. Albernaz* v. *United States,* 450 U.S. 333, 342 (1981) (Congress presumed to be aware of existing law and to legislate with it in mind). We therefore conclude, as the Supreme Court did in *Chadha,* that the language of the

---

[2] We deem it irrelevant for purposes of analysis that the severability provision currently is set forth in a note rather than in an independent provision in the United States Code. The legislation, as originally enacted, contained an independent "Separability Provision." *See* Pub. L. No. 93–236, § 604, 87 Stat. 1023 (1974) The subsequent decision to classify the statutory provision as a note was made by the Law Revision Counsel of the House of Representatives, as authorized by 2 U.S.C. § 285b, and not by Congress itself as a legislative act.

severability clause "is unambiguous and gives rise to a presumption that Congress did not intend the validity of the Act as a whole, or any part of the Act, to depend upon whether the veto clause . . . was invalid." 462 U.S. at 932.

The Supreme Court in *Chadha* also determined that "a provision is further presumed severable if what remains after severance 'is fully operative as a law.'" 462 U.S. at 934 (quoting *Champlin Refining Co.* v. *Corporation Comm'n,* 286 U.S. at 234). Similar to the legal situation under the statutory scheme remaining after severance in *Chadha,* the Secretary's sale authority under § 761 and §§ 765–767 is fully operative and remains a workable administrative machinery without the legislative veto provisions in § 761(a)(3) and § 761(d). The Secretary's authority to sell Conrail as an entity under § 761 remains, independent of the two-House veto provision, and that authority is channeled by the congressionally defined goals of ensuring continued service and of maximizing the return of the United States on its investment. *See* 45 U.S.C. § 761(a)(2). The Secretary's authority to sell Conrail as an entity also continues to be subject to the profitability determinations of the USRA Board: under certain conditions the Secretary must attempt sale as an entity and has no discretion to negotiate for transfers of assets. Moreover, Congress' oversight of the exercise of this delegated authority is preserved, because pursuant to § 761(a)(2) the Secretary is to submit to Congress any plan for the sale of Conrail's common stock.[3] And as *Chadha* suggests, although the legislative veto provision in § 761(a)(3) is invalid, Congress would presumably retain the power, during the time allotted in § 761(a)(3), to enact a law, in accordance with the requirements of bicameralism and presentment set forth in Article I of the Constitution, forbidding the submitted sale plan. *See* 462 U.S. at 971–72 n.8.

Likewise, the Secretary's authority to negotiate freight transfer agreements under § 765, subject to the congressional goals set forth in § 766(a), remains fully operative. Independent of the one-House veto provision in § 767(d), the administrative process adopted by Congress — comprising USRA Board approval of the Secretary's determination of inability to sell Conrail as an entity, negotiations and conferences between the Secretary and parties interested in developing freight transfer agreements, public comment, and the advice of the Attorney General and the ICC on the transfer agreements — remains otherwise intact. Congressional oversight is ensured because § 765(f) requires the Secretary to submit reports to Congress every six months on her activities in negotiating freight transfer agreements.[4] And, as noted above, Congress presumably retains the power to reject, albeit by plenary legislation, the freight transfer agreements within the 60–day time period for legislative review established by the statute. Unquestionably, both §§ 761 and 767 survive as workable

---

[3] Although § 761(a)(2) is phrased in terms of "the Secretary may submit," it is unclear what range of discretion is thereby granted the Secretary. Presumably, the Secretary would not have to submit clearly unviable or uneconomical proposals that fail to meet the congressional goals of continued service and maximum return to the United States on its investment.

[4] Section 765(f) further requires concurrent notification of Congress and the USRA Board whenever the Secretary finds that she is unable to sell Conrail as an entity.

administrative mechanisms. Accordingly, we conclude that the second indicator relied on in *Chadha*, that a court may presume a provision severable if what remains after severance is fully operative as law, is fulfilled in the present instance.[5]

### III. Legislative History

Because the statutory mechanism in §§ 761–767 is operable absent the legislative review provisions in § 761(a)(3) and § 767(d), and because the statute contains a severability clause, the Secretary is presumed to have authority under §§ 761 and 765–767 to sell Conrail as an entity or by sale of assets unless the legislative history rebuts the presumption that Congress would have wished the Secretary to exercise this authority without the opportunity for congressional veto. Although nothing in the legislative history definitively indicates what Congress would have done had it known it could not rely on the legislative veto provisions, we believe that the legislative history, taken as a whole, suggests that Congress would have wanted the Secretary to exercise the sale authority even without the legislative vetoes. More significantly, similar to the situation in *Chadha*, the legislative history is not sufficient to rebut the presumption of severability because there is no compelling evidence that Congress would have refused to grant the sale authority to the Secretary. *See* 462 U.S. at 932.

Prior to the Omnibus Budget Reconciliation Act, legislation was introduced in both the House and Senate to improve rail service in the Northeast, to restructure and render profitable Conrail's operations, and to provide for the sale of Conrail to the private sector. *See* S. Rep. No. 101, 97th Cong., 1st Sess. (1981) (S. 1100, providing for transfer of Conrail by sale of assets to private sector railroads); H.R. Rep. No. 153, 97th Cong., 1st Sess. (1981) (H.R. 3559, providing for sale of common stock of Conrail if profitable and sale of assets if not profitable). H.R. 3559 and the report thereon were incorporated in the House Report on the Omnibus Budget Reconciliation Act of 1981. *See* H.R. Rep. No. 158, Vol. II, 97th Cong., 2d Sess. 438 (1981). S. 1100, to the extent it is reflected in the Senate amendments to the House Report, was considerably altered during consideration of the Omnibus Budget Reconciliation bill, largely to express congressional intent "that to the extent practicable, the Secretary shall make every effort to transfer Conrail as a single entity." S. Rep. No. 139, 97th Cong., 2d Sess. 328 (1981). At all stages, however, the legislative history reveals a strong, indeed urgent, congressional intent to achieve fundamental changes in the efficiency and cost structure of Conrail and, most importantly, to provide for the orderly sale of Conrail either as an entity, if feasible, or by

---

[5] In treating the operability of a statute after excision of an unconstitutional provision from it as creating a "presumption" of severability, the Court in *Chadha* went beyond its decision in *Champlin*, 286 U.S. 210 (1932), in which a "presumption" was created only by the existence of a severability clause in the statute before it. In *Buckley v. Valeo*, 424 U.S. 1, 108–09 (1976), the Supreme Court dealt with a statute that did not contain a severability clause and found an unconstitutional provision in that statute to be severable by relying on the fact that the statutory scheme was fully functional; the Court did not, however, use the word "presumption" in *Buckley*.

158

sale of assets. *See* S. Rep. No. 101, 97th Cong., 1st Sess. 2–3 (1981); H.R. Rep. No. 153, 97th Cong., 1st Sess. 205 (1981). Congress made clear that "the purpose of the legislation is to remove the federal government from the rail freight business." *Id.* at 2. If the legislative veto is regarded as inseverable, however, the Secretary's authority to sell Conrail is invalid and the major objective of the legislation would be frustrated. Given the choice between continuing the Secretary's authority to sell Conrail or denying the Secretary authority to undertake any sale plans, it is probable that Congress would have opted for continuation of the existing method for eliminating federal involvement with rail freight service.

More important, nothing in the legislative history indicates that Congress would not have delegated the sale authority to the Secretary but for the existence of the invalid legislative veto device. The House bill delegated "broad authority," 127 Cong. Rec. 19503 (1981), "much latitude," H.R. Rep. No. 153, 97th Cong., 1st Sess. 8 (1981), to the Secretary to sell the common stock of Conrail and to transfer Conrail assets, without linking that broad authority to the existence of the legislative vetoes.[6] Indeed, the Secretary's authority to sell the common stock of Conrail was not subject to any congressional review. *See id.* at 61. Although the House bill qualified the Secretary's authority to sell Conrail by sale of assets with a provision for a one-House veto within 90 days of submission of the transfer plan, neither the House Report nor the additional comments on the House bill in the House Conference Report in any way indicate that such authority was granted only in light of the veto provision. To the contrary, the Reports simply describe the working of the congressional review provision, but fail to mention, much less emphasize, the significance of the legislative veto device. *See Consumer Energy Council* v. *FERC,* 673 F.2d at 442 (severability argument aided insofar as Conference Report fails to stress importance of legislative veto provision).

The Senate Amendment set forth more elaborate procedures for public comment and notification of Congress with respect to freight transfer agreements. Congress had 120 days within which to disapprove the transfer agreements by concurrent resolution. In addition, the ICC and the Attorney General were to report to Congress on the aggregate of transfer agreements negotiated by the Secretary "to provide assistance to Congress in its deliberations." S. Rep. No. 139, 97th Cong., 1st Sess. 330 (1981). Although these provisions suggest that Congress intended to retain the ability to engage in a meaningful review of the transfer agreements, the Senate Committee Report did not regard the Secretary's sale authority as inextricably bound to this invalid legislative review provision. Moreover, the period for congressional review was reduced to 60 days in the Conference substitute. *See* 127 Cong. Rec. 19505 (1981). In addition, although the final House Conference Report summarily describes the

---

[6] As explained in the House Conference Report, the provisions of the subtitle of the Omnibus Budget Reconciliation Act that involve Conrail, as they appear in the conference substitute, and the corresponding provisions of the House bill and Senate amendment, are discussed in an explanatory statement printed in the Congressional Record. *See* H.R. Conf. Rep. No. 208, 97th Cong., 1st Sess. 368–69 (1981).

159

shortened 60–day period for congressional review of asset sales, it fails altogether to mention the provision for congressional review of a stock sale. *See id.* This lack of emphasis on the importance of the legislative veto provisions indicates that Congress did not regard the provisions as essential to, or inseverable from, the statutory scheme for the sale of Conrail. *See Consumer Energy Council* v. *FERC,* 673 F.2d at 442.

Finally, we note that the leadership of the House Committee on Energy and Commerce and of the Subcommittee on Transportation has initiated legislation to replace the legislative veto provisions in §§ 761(a)(3) and 767(d) with a requirement that any sale plan be enacted into law in conformity with the Article I procedures governing the exercise of legislative authority. You have also informed us that the informal view of some Committee staff members is that the Secretary's authority to arrange for the sale of Conrail is invalid because the unconstitutional vetoes in §§ 761(a)(3) and 767(d) are inseverable from the remaining statutory sale authority. As a general matter, "postenactment developments cannot be accorded 'the weight of contemporary legislative history.'" *North Haven Bd. of Education* v. *Bell,* 456 U.S. 512, 535 (1982). And the normal hesitancy of the courts to attach much weight to comments made after the passage of legislation, *see County of Washington* v. *Gunther,* 452 U.S. 161, 176 n.16 (1981), is necessarily reinforced when those comments are the informal views of staff members. Similarly, we do not accord such informal postenactment comments any weight in our assessment of what the 97th Congress would have intended in the absence of the legislative review provisions. *See id.* It is significant, however, that the Secretary's basic authority to arrange for the sale of Conrail stock or to negotiate for transfers of its assets would be preserved under the proposed amendment. To the extent the proposed amendment indicates anything about Congress' choice between refusing to grant the Secretary any authority to engage in the sale of Conrail or authorizing the Secretary to continue to pursue the effort to remove the federal government from subsidizing and running rail freight service, it is supportive of our conclusion that Congress would have desired that the Secretary retain the authority to sell Conrail.

### IV. Conclusion

In sum, the legislative history provides insufficient evidence to rebut the presumption of severability created by the presence of a severability clause and the existence, after severance, of a "fully operative" law and workable administrative machinery. We therefore conclude that although the two-House disapproval mechanism contained in § 761(a)(3) and the one-House disapproval device set forth in § 767(d) are unconstitutional, the Secretary retains authority under the remaining provisions in §§ 761–767 to sell Conrail as an entity or by sale of assets. The Secretary is still required, under § 761(a)(2), to submit to Congress, 60 days prior to its effective date, a plan for the sale of the United States's stock interest in Conrail; we would also, under the reasoning in

*Chadha,* read the remaining, valid portion of § 767(d) to require the Secretary to transmit copies of any freight transfer agreements to Congress within ten days of their approval. Congress would then have the opportunity to overrule the Secretary's actions, but only by legislative action that conforms with the bicameralism and presentment to the President requirements of Article I, § 7, cls. 2 & 3 of the Constitution.

RALPH W. TARR
*Deputy Assistant Attorney General*
*Office of Legal Counsel*