AB, an infant, by her aunt and legal guardian; CD; EF; GH, an infant, by her father and natural guardian; IJ; KL; and Cathy Conley, Plaintiffs,

v.

RHINEBECK CENTRAL SCHOOL DISTRICT and Thomas Mawhinney, Defendants.

No. 03 CIV. 3241(SCR).

United States District Court, S.D. New York.

Aug. 24, 2004.

Lee F. Bantle, Bantle & Levy, L.L.P., New York, NY, for Plaintiffs.

Mark C. Rushfield, Shaw & Perelson, L.L.P., Highland, NY, James R. Schultz, Maynard, O'Connor & Smith, Albany, NY, for Defendants.

## MEMORANDUM DECISION AND ORDER

ROBINSON, District Judge.

### I. *BACKGROUND:*

There are currently two motions pending before this Court in connection with this matter. First, the Rhinebeck Central School District (the "District") has filed a motion to dismiss (the "District's Motion") certain aspects of the Plaintiffs' complaint (the "Complaint"). Second, the United States of America (the "Government") has filed a Motion to Intervene (the "Government's Motion"). Before addressing the merits of those motions, a brief discussion of the factual and procedural history of this matter is necessary.

#### A. FACTUAL BACKGROUND:

The District hired Thomas Mawhinney ("Mr. Mawhinney") in 1993 to serve as the

principal at Rhinebeck High School ("RHS") and he served in this capacity until June 2003. During the fall of 1993, shortly after his hiring, female students at RHS began complaining to various school officials, including the guidance counselor and the guidance secretary, that Mr. Mawhinney's conduct made them feel uncomfortable. In the summer of 1994, several teachers and/or guidance counselors attempted to raise the issue of sexual harassment at a faculty meeting but were prevented from doing so by Mr. Mawhinney, who stated that sexual harassment was not an issue at RHS.

From 1993 to 1995, the faculty members reported various incidents of sexual harassment to the District Superintendent, Joseph L. Phelan ("Mr. Phelan").[1] In February and March 1996, several parents, guidance counselors, and teachers made numerous reports to Mr. Phelan and the Board of Education (the "Board") regarding Mr. Mawhinney's inappropriate sexual behavior toward students. During the 1995–1996 school year, a student filed a formal complaint with the District claiming that Mr. Mawhinney made a statement to her to the effect that he would welcome oral sex with her. The District investigated this complaint, but ultimately decided the investigation was "inconclusive." (Complaint at 4). In 1996, the parents of this female student filed a complaint with the United States Department of Education Office for Civil Rights (the "OCR"). While this complaint was being investigated by the OCR, parents of RHS students attended a meeting of the Board and asked the Board to delay the vote to grant Mr. Mawhinney tenure until all investigations of his conduct were completed. The Board denied this request and granted Mr. Mawhinney tenure earlier than is customary. (Complaint at 4–5). The OCR investigation resulted in the District signing a Resolution Agreement as-suring the OCR that it would revise its grievance procedures, provide continuing training for employees and students on issues of gender and sexual harassment, requiring counseling and sensitivity training for Mr. Mawhinney, closely monitor Mr. Mawhinney's behavior, and not retaliate against any complainants.

In the case before this Court,[2] the plaintiffs consist of four students from RHS, identified as AB, EF, GH, and KL, and Cathy Conley ("Ms. Conley"), the attendance staff member of RHS (collectively, AB, EF, GH, KL and Ms. Conley are referred to herein as, the "Plaintiffs"). Both AB and GH are minors.[3] AB is represented by her aunt and legal guardian, identified as CD; GH is represented by her father and natural guardian, identified as IJ.

AB attended RHS from 2000 to 2002, at which time she withdrew because of the alleged harassment by Mr. Mawhinney. AB claims that soon after she began attending RHS, Mr. Mawhinney became sexually interested in her, regularly engaging in unwelcome touching, including rubbing her back, placing his arm around her shoulder and hugging her. While touching her, Mr. Mawhinney made comments to AB such as "You're my favorite student" and "How ya doin', buddy?" (Complaint at 5). According to AB, Mr. Mawhinney regularly stopped her in the hallway to talk to her; he seemed to follow her around school, coming into her classes to make sure she was there. Sometime in January 2002, Mr. Mawhinney came up to AB in the cafeteria, wrapped his arms around her and rubbed his cheek against hers. At the end of February 2002, Mr. Mawhinney chose AB to travel with him to the Church of Messiah to sell senior citizen prom tickets. While in the car, AB alleges

---

**1.** During this time, the faculty members reported that Mr. Mawhinney touched a female student's hair to inspect a "hickey," that he told the boyfriend of a girl with abdominal pain that he was "too rough with her last night," and that his inappropriate, unwelcome attention to female students had caused them to cry. (Complaint at 4).

**2.** The Complaint also describes numerous instances of alleged sexually harassment by Mr. Mawhinney toward other female students, whom are not plaintiffs in this action. According to the Complaint, many of those incidents were reported to Mr. Phelan, which supports the Plaintiffs' contention that the District had notice and was deliberately indifferent to Mr. Mawhinney's conduct. These other instances are not discussed in this Memorandum Decision and Order.

**3.** At the time of the filing of the Complaint, both AB and GH were 16 years old.

that Mr. Mawhinney reached over and began rubbing her thigh. AB pulled away from Mr. Mawhinney, and he stopped touching her after about a minute. When Mr. Mawhinney and AB returned to school, Mr. Mawhinney told AB she could skip her Math and English classes that day because he was the "proper authority." (Complaint at 6).

As a result of this alleged harassment, AB began to avoid Mr. Mawhinney, choosing not to eat in the cafeteria because he was often there, trying not to go into the school's main office where his office was located, planning her routes from class to class to avoid him, and surrounding herself with a group of students when walking in the hallways. Despite these efforts, AB claims Mr. Mawhinney found her and displayed his unwelcome interest in her. AB claims that, as a result of this sexual harassment by Mr. Mawhinney, her grades dropped because she could not focus in class or on her homework. AB also says she began to withdraw socially, believing that what was happening to her was somehow her fault.

On or about June 13, 2002, AB reported Mr. Mawhinney's harassment of her to a social worker. The matter was later referred to Mr. Phelan, for investigation. Mr. Phelan interviewed AB, who told him about many of the incidents set forth above, and he issued a report in August 2002 clearing Mr. Mawhinney of any charges of sexual harassment. However, Mr. Phelan claims he issued a counseling letter to Mr. Mawhinney and required Mr. Mawhinney to participate in a refresher course in the avoidance of sexual harassment, which consisted of a single, two-hour session.

At the beginning of the 2002–2003 school year, AB claims Mr. Mawhinney retaliated against her, following her around, scrutinizing her behavior, and trying to find fault with her conduct. On or about September 20, 2002, Mr. Mawhinney allegedly summoned AB to his office, pulled his chair very close to AB's chair and told her he wanted to discuss the situation. AB claims she told Mr. Mawhinney she was uncomfortable, slid her chair away from his, and asked to leave his office. Mr. Mawhinney told her he was not happy with what AB had done. After spend-

ing approximately 15 minutes in his office, AB claims she fled in tears. AB's mother complained to Mr. Phelan about this meeting, but Mr. Phelan said he did not think the incident constituted harassment or retaliation.

In late September 2002, AB withdrew from RHS. She was home tutored for several months and then transferred to a different school district. AB's family could not afford to pay the tuition charged to an "out of district" student and AB was placed under the legal guardianship of her aunt, CD, and moved from her family home to her aunt's home in order to reside in a different school district. (Complaint at 8). AB attends psychological counseling and anger management classes. (*Id.*)

EF was a student at RHS from 1999 to Spring 2002, at which time she withdrew, citing harassment by Mr. Mawhinney as the principal reason for her withdrawal. EF claims that soon after she began her freshman year, she both heard reports of and observed Mr. Mawhinney inappropriately touch female students. Thus, EF tried to avoid Mr. Mawhinney. EF claims Mr. Mawhinney made sexually suggestive comments to her on numerous occasions, one time telling her "X marks the spot" on a day she was wearing a shirt with an X over her chest. (Complaint at 8). In late May or early June 2001, EF reported to Mr. Mawhinney that a boy at the school was making sexual innuendos toward her to which Mr. Mawhinney allegedly responded, "If I were him, I would have done a lot more than that." (Complaint at 8). EF reported these incidents to Mr. Phelan in September 2002. Mr. Phelan determined that no action needed to be taken. In March 2002, EF withdrew from RHS and began a program of home tutoring.

GH is currently a student and athlete at RHS. When GH began attending RHS, she was aware of Mr. Mawhinney's reputation for sexually inappropriate behavior with female students and knew of a specific incident in which Mr. Mawhinney had sexually harassed another female student. GH claims Mr. Mawhinney tried to engage her in conversation on a daily basis for no apparent reason. This made GH feel awkward and uncomfortable.

In the fall of 2001, GH says Mr. Mawhinney sat next to her in the cafeteria and asked her if she knew why girl runners get slower as they grow older; when GH replied she did not, Mr. Mawhinney allegedly told her it was because girls "put on fat in certain parts of their upper bodies," while simultaneously gesturing with his hands in front of his chest to suggest breast growth. (Complaint at 9). In May 2002, Mr. Mawhinney allegedly approached GH, who was standing with two of her athletic coaches and a male student, and repeated his remarks about why girl runners get slower. One of GH's coaches disagreed and explained that female speed decreases because their bones get denser and their hip structure widens in preparation for childbirth. GH claims Mr. Mawhinney replied, "I can't wait to see what happens to GH when her hips spread," and that his tone and demeanor suggested he was talking about sexual intercourse. GH says she was humiliated and degraded by these remarks. This incident was reported to Mr. Phelan, who determined that Mr. Mawhinney's conduct did not rise to the level of sexual harassment.

KL attended RHS from 1996 to 2000. She was a cheerleader from 1995 to 1999. During this time, KL claims Mr. Mawhinney often attended cheerleading practice and basketball games and stared at her and other cheerleaders in a way that made her very uncomfortable. As a result of this behavior and other inappropriate sexual conduct that KL claims was known to her, KL says she did not feel safe when Mr. Mawhinney was around. In the winter of 1999, KL attended the RHS Winter Ball. While at this Ball, KL claims Mr. Mawhinney approached her, drew himself very close, placed his hand on her left shoulder, which was bare due to the style of her dress, and said, "You're the sexiest girl here." (Complaint at 11). KL fled to the bathroom, where she remained until she thought it was safe to leave. Upon leaving the bathroom, KL says Mr. Mawhinney approached her and asked her if she was alright and then continued to follow her around for the entire night. KL withdrew from RHS and completed her graduation requirements at Dutchess County Community College. KL returned to RHS to participate in graduation ceremonies in June 2000. KL claims Mr. Mawhinney stared and leered at her on this occasion, and she was distressed to have to make physical contact with him when shaking his hand to receive her diploma. KL reported the incidents to Mr. Phelan in December 2002 in writing. Mr. Phelan allegedly disregarded this letter, claiming that it was not notarized and no immediate witnesses were offered. KL says she identified at least one witness, but Mr. Phelan took no action.

Cathy Conley has worked at RHS since 1993. Currently, she works as the attendance staff member at RHS. During the course of her employment, Ms. Conley claims to have witnessed Mr. Mawhinney engage in inappropriate conduct toward female students, rubbing their backs and shoulders, watching them walk down the hallway with a "salacious" expression. (Complaint at 14). On or about November 20, 2002, Ms. Conley attended an open community meeting of approximately 25–30 people gathered to discuss Mr. Mawhinney's behavior toward students and the lack of effective response by Mr. Phelan and the District. Following her attendance at this meeting, Ms. Conley claims Mr. Mawhinney began to retaliate against her. Ms. Conley alleges that on or about the morning of November 21, 2002, Mr. Mawhinney confronted her about why she attended the meeting and questioned her as to which other faculty and staff members attended. Ms. Conley says Mr. Mawhinney told her he was very angry that she had gone to the meeting. Ms. Conley claims that Mr. Mawhinney continues to treat her differently, regularly glaring at her and generally not speaking to her. On or about January 15, 2003, Ms. Conley says Mr. Mawhinney yelled at her for letting a student who was sick call his mother.

On or about March 18, 2003, Ms. Conley signed out Mr. Phelan's son for a career program. Ms. Conley later received a confidential memo from Mr. Mawhinney advising her to set up a meeting between them and the middle school principal regarding signing out students under 16 years of age. Ms. Conley was advised to bring her union representative because the meeting might "result in disciplinary action." (Complaint at 15).

Ms. Conley was unaware of any school policy regarding signing out students under the age of 16. Ms. Conley alleges that to this date, Mr. Mawhinney continues to hold out the threat of discipline against her in connection with this incident.

Ms. Conley further alleges that a female student came to her and told her that she was growing increasingly uncomfortable with Mr. Mawhinney because of his remarks about how attractive she was. Ms. Conley sent a memo to Mr. Phelan articulating her concern about Mr. Mawhinney's behavior, reporting to him what the female student told her and that Mr. Mawhinney had told another female student that her overly short blouse might violate school dress code, but that he would overlook it because he liked it. Mr. Phelan called Ms. Conley and allegedly told her to be careful about reporting such allegations. Mr. Phelan then sent Ms. Conley a memorandum saying that he needed the names of the students and the witnesses in order to be able to conduct an investigation.

B. PROCEDURAL BACKGROUND:

On or about May 9, 2003, the Plaintiffs filed a complaint against the District and Mr. Mawhinney (the "Defendants"), seeking relief on five grounds: 1) against the District for a violation of Title IX ("Count I"); 2) against the District for negligent hiring, training, supervision, and retention ("Count II"); 3) against Mr. Mawhinney and the District for assault and battery ("Count III"); 4) against Mr. Mawhinney and the District for negligent infliction of emotional distress ("Count IV"); 5) against Mr. Mawhinney for intentional infliction of emotional distress ("Count V"). The Plaintiffs amended their complaint on or about August 29, 2003, to include a claim against the District for a violation of equal protection the under the Fourteenth Amendment and 42 U.S.C. § 1983. ("Count VI"). In summary, the Plaintiffs argue that Mr. Mawhinney's sexual harassment of female high school students and the District's subsequent indifference to this harassment violate the Plaintiffs' rights under Title IX, the Fourteenth Amendment, and New York State law.

On or about February 3, 2004, the District submitted a Motion to Dismiss portions of the amended complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure (the "District's Motion"). The District sought dismissal of the Plaintiffs' § 1983 claim and all state law tort claims against the District. In their opposing brief (the "Plaintiffs' Opposition"), the Plaintiffs note that, pursuant to a stipulation, they have agreed to withdraw Counts II, III, IV and VI. Thus, only Counts I and V remain, consisting of a claim against the District for violation of Title IX and a tort claim against Mr. Mawhinney for intentional infliction of emotional distress. Of these two remaining counts, the District, in its reply (the "District's Reply"), continues to challenge Ms. Conley's ability to maintain a retaliation suit under Title IX.

Additionally, on or about March 18, 2004, the United States of America (the "Government") submitted a Motion to Intervene pursuant to Fed.R.Civ.P. 24 (the "Government's Motion"). The Government seeks intervention as a matter of right pursuant to Fed. R.Civ.P. 24(a). Alternatively, if this Court finds that the Government does not meet the requirements for intervention as a matter of right, the Government requests that the Court exercise its discretion pursuant to Fed. R.Civ.P. 24(b) and permit the Government to intervene. The District opposes the Government's intervention (the "District's Opposition"), arguing that: a) the Government's Motion is untimely; b) the Government has threatened the confidentiality of information concerning the students; c) the Government has engaged in a course of conduct indicating a greater interest in generating publicity than the appropriate resolution of non-continuing claims; d) the Government's intervention may delay the proceedings; and e) the Government will not be prejudiced if not allowed to intervene.

II. *MOTION TO DISMISS:*

The District's Motion seeks to dismiss portions of the amended complaint pursuant to Fed.R.Civ.P. 12(b)(1) (lack of subject matter jurisdiction) and 12(b)(6) (for failure to state

a claim) on a number of grounds.[4] Subsequent to the filing of the District's Motion, the parties have stipulated that the § 1983 and state law tort claims against the District would be voluntarily dismissed without prejudice. The District does not request dismissal of the claim against them for violation of Title IX nor do they seek dismissal of the state law tort claim against Mr. Mawhinney. Therefore, the only issue remaining before this Court on the District's Motion is the question of whether Ms. Conley can sustain a retaliation claim under Title IX.

### A. STANDARD OF REVIEW:

 The standards for dismissal under 12(b)(6) and 12(b)(1) are substantively identical. *Lerner v. Fleet Bank,* 318 F.3d 113, 128 (2d Cir.2003). When reviewing a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the court may only dismiss the complaint if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In making this determination, the court is limited to consideration of the complaint and must accept all factual allegations within the complaint as true, drawing all reasonable inferences in favor of the plaintiff. *Id.* It is immaterial whether recovery seems remote or unlikely on the face of the pleading. *Id.* The court must simply consider "whether the claimant is entitled to offer evidence to support the claims." *Id.* (citing *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995)).

### B. ANALYSIS:

Ms. Conley alleges that she suffered retaliation for her attendance at a public meeting held to discuss Mr. Mawhinney's behavior toward students and the District's lack of response, and for reporting Mr. Mawhinney's inappropriate behavior to Mr. Phelan. Ms. Conley does not claim that she, herself, suffered sexual harassment. The District sets forth two arguments in favor of dismissal of Ms. Conley's retaliation claim under Title IX. First, the District argues that Title IX does not provide a private right of action for an employee. Second, the District asserts that, even assuming a private right of action for damages for employment discrimination/retaliation can be asserted under Title IX, Ms. Conley fails to establish a prima facie case, having provided no evidence that she has been subjected to an adverse employment action.

#### 1. Retaliation Claims Under Title IX:

The District asserts that Title IX does not permit Ms. Conley to raise a retaliation claim; rather, Ms. Conley, as an employee who does not claim that she, herself, has suffered gender discrimination, is only permitted recourse for retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000.[5] This issue is unsettled by both the United States Supreme Court and the Second Circuit. Judge Patterson has noted that "[t]here is a split among the circuit courts and within the courts of [the Southern District of New York] over whether Title IX provides employees of educational institutions receiving federal funds with a private right of action to recover money damages for discrimination." *Marks v. New York University,* 61 F.Supp.2d 81, 101 (S.D.N.Y.1999). Central to this split is a disagreement over the degree to which the parameters of Title IX have been established by three Supreme Court cases: *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d

---

4. In this Motion, the District requested: 1) the § 1983 and state law claims against the District be dismissed because the District has Eleventh Amendment Immunity; 2) the § 1983 claim against the District be dismissed because the Plaintiffs' Title IX claim precludes suit under § 1983; 3) the § 1983 claim be dismissed because it fails to state a claim; and 4) Plaintiff, Ms. Conley's employment discrimination/retaliation claim under Title IX be dismissed because it fails to state a claim.

5. Although the District asserts that Ms. Conley would have recourse under Title VII, the District also argues that Ms. Conley's retaliation claim under Title VII would be barred because she has not adhered to the procedural requirements of Title VII. Ms. Conley has not filed a claim with the U.S. Equal Opportunity Commission nor secured a "right to sue letter." (District's Motion 8–9).

**152**

560 (1979); *North Haven Board of Education v. Bell*, 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982); *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). In *Cannon*, the Supreme Court found that the plaintiff, a woman who alleged that she was denied admission to medical schools receiving federal funds, had a private cause of action under Title IX despite the statute's absence of such express language. Applying the four factors provided in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Court determined it was appropriate to imply a private right of action. *Cannon* at 710, 99 S.Ct. 1946. In *Bell*, the Court upheld regulations promulgated by the Department of Health, Education, and Welfare pursuant to Title IX, prohibiting sex discrimination with respect to employment in federally funded programs. In its analysis, the Court interpreted § 901(a) of Title IX as covering and protecting students and employees of federally funded programs from gender discrimination. *Bell* at 520–521, 102 S.Ct. 1912. Finally, in *Franklin*, the Court held that money damages were available for a student-plaintiff filing an action for sexual harassment. *Franklin* at 72–76, 112 S.Ct. 1028.

Ms. Conley argues that requiring her "to bring her claim for retaliation under Title VII would frustrate Congress' intent to prohibit employment discrimination in educational institutions under Title IX." (Plaintiffs' Opposition at 6). Specifically, Ms. Conley submits that Title VII was not intended to strip an aggrieved individual of other remedies they may possess. *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459, 95 S.Ct. 1716, 44 L.Ed.2d 295, (1975). In support of her position, Ms. Conley relies primarily on the reasoning in *Henschke v. New York Hosp.–Cornell Med.*

*Center*, 821 F.Supp. 166 (S.D.N.Y.1993) (Preska, J.), which states that, taken together, the above-referenced Supreme Court cases and the legislative history of Title IX "demonstrate[ ] an intent on the part of Congress to have Title IX serve as an additional protection against gender-based discrimination in educational programs receiving federal funding regardless of the availability of a remedy under Title VII." [6] *Id.* at 172. Judge Preska found that "the Supreme Court and Second Circuit interpretations of the statute do not permit the contrary conclusion." *Id.*

The District relies primarily on the reasoning in *Burrell v. City University of New York*, 995 F.Supp. 398 (S.D.N.Y.1998) (Sweet, J.) to support its claim that Title IX does not permit a retaliation claim by an employee. Unlike Judge Preska, who in *Henschke* read the Supreme Court cases broadly, Judge Sweet indicated his belief that the parameters of Title IX have been only "partially established" by the above-referenced Supreme Court cases. *Id.* at 408. In his decision, Judge Sweet concluded that Title IX remedies are limited to student-plaintiffs, and Title VII is meant to be the exclusive remedy for employment discrimination. *Id.* at 410. In making this determination, Judge Sweet provided two rationales: 1) Title VII's comprehensive scheme should not be bypassed; and 2) Title VII was meant to preempt subsequent remedies.[7] *Id.* Relying on this reasoning, the District argues that allowing an employee to raise a retaliation claim under Title IX "would gut the exhaustion of administrative remedies in the Title VII scheme...as employees of federally funded institutions would be entitled to bypass or ignore the Title VII exhaustion requirements by simply bringing employment

---

6. In a footnote, Ms. Conley states that retaliation claims have been routinely permitted under Title IX by both student and employees. The District does not challenge a student's ability to raise a retaliation claim under Title IX, only an employee's.

7. As to the first rationale, Judge Sweet found that "[t]he concern that Title VII requirements remain intact for employment discrimination is persuasive" because "[t]o hold otherwise would

be to create an avenue of relief for employees of federally funded educational institutions which differs significantly from the path afforded to other employees." *Burrell* at 410. As to the second rationale, Judge Sweet found that because Title VII is a "comprehensive and carefully balanced remedial mechanism" it would take more "to persuade that Congress intended to imply remedies for employment-related discrimination." *Id.*

discrimination actions under Title IX." (District's Motion 9).

While neither party cited any controlling decisions by the Second Circuit on this issue, it should be noted that there is a split among several other Circuit Courts, which have addressed it. *See e.g. Preston v. Commonwealth of Virginia ex rel. New River Community College*, 31 F.3d 203 (4th Cir.1994) (an implied private right of action has been established by *Cannon* that extends to employment discrimination on the basis of gender by educational institutions receiving federal funds); *Lakoski v. James*, 66 F.3d 751 (5th Cir.1995) (Title VII is the exclusive remedy for individuals alleging employment discrimination on the basis of sex in federally funded education institutions); *Jackson v. Birmingham Board of Education*, 309 F.3d 1333 (11th Cir.2002) (Title IX does not provide a private right of action to employees claiming retaliation).

■ This Court has reviewed the Supreme Court's decisions in *Cannon, Bell* and *Franklin*, as well as the district court decisions interpreting those case. Based upon that review, this Court finds that Title IX was intended by Congress to function as an additional safeguard against gender-based discrimination in the context of federally funded education programs; notwithstanding the possibility of other available remedies, including without limitation those available under Title VII. Accordingly, this Court finds that Ms. Conley, as an employee of the District, which receives federal educational funding, is eligible to bring an action under Title IX. Having determined that Ms. Conley is eligible to bring a Title IX lawsuit, this Court must determine whether she has alleged the requisite elements for a prima facie case.

**2. The Prima Facie Case:**

The District argues that, even assuming that a private right of action for damage for retaliation can be asserted under Title IX, Ms. Conley fails to establish a prima facie case. Specifically, the Defendant asserts that the Plaintiff has provided no evidence that she has been subjected to an adverse employment action. As set forth above, the District's Motion is made pursuant to Fed. R.Civ.P. 12(b)(1) and 12(b)(6). As such, this Court's inquiry is whether it is possible for Ms. Conley to prove a set of facts, which would entitle her to relief. When performing that inquiry, this Court must accept Ms. Conley's factual allegations as true and draw all reasonable inferences in her favor.

■ Title IX claims are analyzed under the same framework as claims arising under Title VII of the Civil Rights Act of 1964.[8] *Murray v. New York Univ. College of Dentistry*, 57 F.3d 243, 248 (2d Cir.1995). To establish a prima facie case of retaliation under Title VII, a plaintiff must show: 1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII; 2) that the employer was aware of that activity; 3) that she suffered adverse employment action; and 4) that there was a causal connection between the protected activity and the adverse action. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 79 (2d Cir.2001).

■ The District submits that Ms. Conley's retaliation claim should be analyzed according to the three-step, burden-shifting framework initially set forth by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[9] However, the District's suggestion

---

8. Both Plaintiffs and Defendant, the District, agree that Title IX violations are analyzed under the same framework as Title VII violations.

9. Under this framework, the plaintiff/employee bears the initial burden of establishing a prima facie case of discrimination. *Id.* at 802, 93 S.Ct. 1817. By satisfying this "minimal" requirement, the plaintiff "creates a presumption that the employer unlawfully discriminated." *James v. New York Racing Ass'n*, 233 F.3d 149, 153–154 (2d Cir.2000) (quoting *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir.1997)). The burden of

production shifts to the defendant/employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If both (a) a minimal prima facie case is proved, and (b) the employer has given a non-discriminatory explanation, the *McDonnell Douglas* presumptions disappear from the case and a plaintiff has the opportunity to show that the legitimate reasons offered by the defendant were not its true reasons, but rather were a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817. However, "a reason cannot be

that this Court should engage in a *McDonnell Douglas,* burden-shifting analysis is premature at this phase of the litigation because such an analysis is inherently evidentiary and involves the shifting, and on occasion re-shifting, of the burdens between the parties. The question that should be considered by this Court in connection with the District's Motion is whether Ms. Conley has alleged a prima facie case for retaliation; not whether her claim will survive a *McDonnell Douglas* burden shifting analysis. More particularly, this Court must determine whether Ms. Conley has alleged an adverse employment action.

The Second Circuit has found that "[a] plaintiff sustains an adverse employment action if he or she endures 'a materially adverse change' in the terms and conditions of employment." *Galabya,* 202 F.3d at 640. To rise to the level of "materially adverse," "a change in working conditions must be more than a mere inconvenience or an alteration of job responsibilities." *Id.* The Second Circuit has advised that "[a] materially adverse change in working conditions might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other [such] indices..." *Id.* at 640. However, adverse employment actions are not limited to "job termination or reduced wages and benefits[;]...less flagrant reprisals may indeed be adverse." *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997).

In describing the retaliatory conduct in the case at bar, Ms. Conley alleges that Mr. Mawhinney treats her "in a hostile manner, threatens her with unjustified discipline and denies her privileges routinely provided to other faculty and staff members." (Complaint at 15). The District argues that Ms. Conley does not allege she experienced any loss of pay or benefits, any diminished responsibilities or any other materially adverse change in the terms and conditions of her employment. (Defendant's Reply at 4).

proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St.*

Hence the District maintains that Ms. Conley has not alleged an adverse employment action. (*Id.*)

 The allegations that Ms. Conley has made, that she has and continues to be (a) treated in a hostile manner, (b) threatened with unjustified discipline, and (c) denied the privileges provided to other faculty and staff members, are certainly different than a reduction in salary or benefits. However, such pecuniary examples of adverse employment actions, which are advanced by the District, are not an exclusive list of the actions that may be considered adverse. As set forth above, when reviewing the District's Motion, this Court must accept all of the factual allegations in the Complaint as true and the question is whether Ms. Conley has made sufficient allegations to permit her to produce evidence in support of such allegations. In the case at bar, this Court finds that Ms. Conley's allegations are sufficient to allege a prima facie case to survive the District's Motion. The evidence adduced during discovery will allow the parties and the Court to evaluate Ms. Conley's allegations and determine whether she can provide factual support for the adverse employment actions, which she has alleged. For all of the reasons set forth above, the District's Motion is denied.

### III. *MOTION TO INTERVENE:*

The Government has made a motion to intervene in the Plaintiffs' action against the District for a violation of Title IX. The Government seeks to intervene pursuant to Fed. R.Civ.P. 24(a)(2), which provides for intervention as a matter of right, or, in the alternative, pursuant to Fed.R.Civ.P. 24(b), which allows for intervention at this Court's discretion.

### A. STANDARD OF REVIEW:

 Fed.R.Civ.P. 24(a)(2) provides a four-part test for intervention as a matter of right:

*Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Upon 1) timely application anyone shall be permitted to intervene in an action when the applicant claims 2) an interest relating to the property or transaction which is the subject of the action and 3) the applicant is so situated that the dispositions of the action may as a practical matter impair or impede the applicant's ability to protect that interest, 4) unless the applicant's interest is adequately represented by existing parties.

*Wash. Elec. Cooperative, Inc. v. Mass. Municipal Wholesale Elec. Co.*, 922 F.2d 92, 96 (2d Cir.1990). The party moving to intervene must meet all four of these requirements to qualify for intervention as a matter of right. *Id.*

 If the party seeking intervention fails to meet the above requirements, the party may still be permitted to intervene pursuant to Fed.R.Civ.P. 24(b). The district court "retains discretion to determine when intervention is appropriate." *Id.* Under Fed.R.Civ.P. 24(b), intervention is appropriate: 1) when a statute of the United States confers a conditional right to intervene; or 2) when an applicant's claim or defense and the main action have a question of law or fact in common. *Kirby v. Coastal Sales Assoc.*, 199 F.R.D. 111, 119 (S.D.N.Y.2001). In making this determination, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties. *Id.*

### B. Analysis:

As set forth above, the Government's primary argument is that it should be permitted to intervene as a matter of right pursuant to Fed.R.Civ.P. 24(a). In support of that argument, the Government asserts that: (a) it has filed its motion in a timely fashion; (b) it has an interest in the action; (c) that interest may be impaired in the absence of intervention; and (d) that interest is not adequately represented by the Plaintiffs.

 The district court has discretion with regard to determining the timeliness of a motion to intervene. *Kirby*, 199 F.R.D. at 117. When exercising that discretion, the district court "should evaluate the applicant's timeliness against the totality of the circumstances before the court." *Duttle v. Bandler & Kass*, 147 F.R.D. 69, 72 (S.D.N.Y.1993) (citing *Farmland Dairies v. Commr. of New York State Department of Agriculture and Markets*, 847 F.2d 1038, 1044 (2d Cir.1988)). The circumstances that the district court should consider include: "1) the length of time the applicant knew or should have known of his interest before making the motion; 2) prejudice to existing parties resulting from the applicant's delay; 3) prejudice to the applicant if the motion is denied; 4) the presence of unusual circumstances militating against a finding of timeliness." *Id.*

 In the case at bar, the Government asserts that upon learning of the Plaintiffs' complaint, which was filed approximately twelve months ago, it commenced an investigation to determine whether intervention was warranted. After conducting that investigation, the Government concluded that intervention was appropriate and promptly filed its motion to intervene. The District contends that the Government's Motion is untimely because: (1) the Government has known of its interest in the issues presented in this litigation not only from the time of the commencement of this litigation almost a year ago, but throughout the at least seven of the past ten years of alleged sexual harassment of students by Mr. Mawhinney; and (2) the Government affirmatively concluded, as late as a month prior to the commencement of this action, that the District was not engaging in conduct violative of Title IX and that it was adhering to an agreement with the Government to establish and maintain compliance with Title IX. (District's Opposition at 2).[10] In response, the Government

10. With respect to the Defendant's first contention, the Defendant refers to the fact that sometime during 1996, parents of a female student filed a complaint with the OCR, which the OCR investigated. This investigation resulted in the signing of a Resolution Agreement assuring the OCR that the District would revise its grievance procedures, provide continuing training for employees and students on issues of gender and sexual harassment, require counseling and sensitivity training for Mr. Mawhinney, closely monitor his behavior, and not retaliate against any complainants. With respect to the Defendant's second contention, the Defendant refers to a let-

argues that it was not put on notice of the current Title IX issues by the OCR complaint involving a single student filed seven years before this lawsuit commenced. (Government's Reply at 5). Further, the Government argues that the Resolution Agreement between the District and the OCR resolved only the 1996 complaint, not any other claims of sexual harassment by Mr. Mawhinney, including the Plaintiffs' claims. (*Id.*) [11]

The District fails to establish that the Government acted in an untimely manner. The fact that a *single* complaint was filed with the OCR in 1996 does not put the Government on sufficient notice of an allegedly *on-going* problem of sexual harassment, which is claimed to have been perpetrated by Mr. Mawhinney. Nor did this single complaint alert the Government to the District's alleged indifference of this on-going problem. Thus, this Court rejects the District's contention that the Government has been aware of the extent of these problems for seven years prior to the case at bar. Although the remedies set forth in the Resolution Agreement were of a broader nature, requiring a revision of the District's grievance procedures with respect to sexual harassment complaints, the Agreement was intended to resolve the issue presented by the single complaint; not to remedy an allegedly on-going problem of sexual harassment and the District's indifference to this problem. If the Agreement had been intended to target the broader problems raised by the case at bar, it would have required very different remedies. Rather, the letter was specifically targeted to the District's compliance with the

Resolution Agreement, which again only resolved the single 1996 complaint.

Further, the Government argues that it would be inappropriate for this Court to deny its motion to intervene for reasons of untimeliness where the District cannot show any prejudice to the parties from intervention and the Government has a compelling interest to protect. (Government's Reply at 4). The Government notes that in both *Blowers v. Lawyers Co-operative Publishing Co.,* 527 F.2d 333 (2d Cir.1975), and *Duttle,* 147 F.R.D. 69, two cases upon which the District relies to support its timeliness argument, the Second Circuit and district court, respectively, found that allowing intervention would have caused severe prejudice to the parties involved.[12] In the current case, the Government states that during its investigation it obtained relevant documents from the parties and does not presently anticipate the need for further document requests upon intervention. Further, the Government notes that the depositions of the key witnesses, Mr. Mawhinney and Mr. Phelan, have not yet been taken and, provided that the transcripts of depositions already taken are made available, it does not anticipate a need to re-take any depositions. (Government's Motion at 4).

Accordingly, for all of the reasons set forth above, this Court finds that the Government's motion to intervene is timely.

 With respect to the second requirement of Fed.R.Civ.P. 24(a)—an interest relating to the action—the Government

---

ter, dated April 17, 2003, from OCR to the District stating that OCR was closing its file regarding the 1996 complaint. (District Aff., Exhibit D). The District interprets this letter more broadly as concluding that the District was in compliance with Title IX.

11. According to the Government, the letter, dated November 26, 1996, makes clear that it "does not cover any issues regarding the District's compliance with Title IX that are not discussed herein." (District's Exhibit D). Additionally, the Government notes, that "although the Resolution Agreement required the District to revise its grievance procedures with respect to sexual harassment complaints, the 1996 Agreement did not resolve the Government's current claim that the District's pattern of deliberate indifference to

complaints received pursuant to those procedures violates Title IX." (Government's Reply at 6).

12. In *Duttle,* the district court stated that "[t]he prejudice to the current parties is the most important consideration in deciding whether a motion for intervention is untimely." *Id.* at 76. Thus, the court ultimately concluded that the IRS's application for intervention was untimely because the IRS's fifteen month delay in filing, in conjunction with the fact that the parties had concluded settlement, would have caused severe prejudice as the parties would have been "forced to expend more time and resources, and to relitigate issues..they had long since left behind." *Id.*

identifies its interests as: (1) the proper enforcement of Title IX, by ensuring that the recipients of federal funds do not discriminate on the basis of sex; and (2) ensuring that federal funds are not given to entities that fail to comply with the federal anti-discrimination laws. This Court finds that because such interests are significant and closely related to the underlying action, the second element of 24(a) is satisfied.

■■■ The third element of Fed.R.Civ.P. 24(a)—impairment of that interest—is satisfied because the Government's ability to protect the above interests would be impaired if it is not allowed to intervene. More specifically, an adverse judgment could interfere with the Government's ability to enforce Title IX with respect to allegations of teacher-on-student sexual harassment; particularly in cases where a school district's response to allegations of sexual harassment proves inadequate to stop the harassment from continuing. Further, a disposition of this action without intervention could impair the Government's interest in preventing further discrimination by the District because the private Plaintiffs could agree to settle this action for money damages without seeking the type of institutional changes by the District that the Government considers necessary to ensure that students are protected from unlawful discrimination and harassment in the future.

■■■ For this same reason the fourth element of Fed.R.Civ.P. 24(a)—adequate representation of interest—is satisfied because the Plaintiffs' action is not a class action. The Plaintiffs, despite alleging a pattern of ongoing sexual harassment, only represent their individual interests. If the Plaintiffs were to settle with the District, the Government's ability to change District's response to sexual harassment complaints may be impeded. The Government certainly has a legally protectable interest in assuring that all students at RHS are protected by Title IX, not merely the Plaintiffs named in this case.

The District's contention that the Government's intervention may make it harder to settle the case highlights the importance of allowing the Government to intervene. The existing Plaintiffs will not adequately represent the Government's interest in this action.

Based upon the above, this Court finds that the Government has satisfied all four of the requirements in order to intervene pursuant to Fed.R.Civ.P. 24(a) and the Government should be permitted to intervene as a matter of right in the instant action. Having found that the Government should be permitted to intervene as a matter of right, this Court need not address the Government's and District's respective arguments regarding permissible intervention pursuant to Fed. R.Civ.P. 24(b).[13]

## IV. CONCLUSION:

For all of the foregoing reasons, this Court hereby finds the following:

A. The District's Motion to Dismiss is denied; and

B. The Government's Motion to Intervene is granted.

It is so ordered.

■■■■■■■■■■■■■■■

---

13. In addition to the arguments set forth above, the District contends that: (1) the Government has threatened the confidentiality of information concerning the students; (2) the Government has engaged in a course of conduct indicating a greater interest in generating publicity than the appropriate resolution of non-continuing claims; and (3) the Government's intervention may delay the proceedings. (District's Opposition 2). This Court finds these arguments to be unpersuasive.